Tina **DEAL** et al., Plaintiffs-Appellants,

v.

The **CINCINNATI BOARD OF EDUCATION** et al., Defendants-Appellees.

No. 16863.

United States Court of Appeals
Sixth Circuit.

Dec. 6, 1966.

Lewis M. Steel, New York City, for appellants, Norris Muldrow, Cincinnati, Ohio, Robert L. Carter, Barbara A. Morris, New York City, on the brief.

C. R. Beirne, Special Counsel for the Cincinnati Board of Ed., Cincinnati, Ohio, for appellees, William A. McClain, City Solicitor, Philip S. Olinger, Asst. City Solicitor, Robert E. Manley, Cincinnati, Ohio, on the brief.

Before WEICK, Chief Judge, and O'SULLIVAN and PHILLIPS, Circuit Judges.

WEICK, Chief Judge.

The suit in the District Court was a class action against the Board of Education of the City of Cincinnati, brought by the parents and next friends of Negro pupils enrolled in the public schools of the city, to enjoin the operation of allegedly racially segregated public schools, to enjoin the construction of new schools on sites which would increase and harden alleged existing patterns of racial segregation, and for declaratory and other relief.

The Board denied that it created, operated or maintained racially segregated schools, and alleged that the only genuine issue in the case was whether it violated the constitutional rights of the plaintiffs by refusing to adopt and enforce an affirmative policy of balancing the races in the Cincinnati Public School System.[1]

---

1. On March 9, 1964, after the commencement of the present action, the Board of Education adopted the following policy statement to guide its officers and employees:

"(1) As a matter of policy, the Board would like to avoid predominantly Negro schools to the extent that the Board has any control over the causes which create such predominance. But in exercising any control in this area the Board will not deviate from the long established neighborhood school plan or the requirement of Section 3313.48 R.C.

The evidence in the case consisted of a number of lengthy stipulations, exhibits, and oral testimony. At the close of plaintiffs' evidence defendants moved for judgment, which motion was taken under advisement by the Court. Defendants presented their entire case except for expert testimony. The Court then granted defendants' motion for judgment without considering the evidence offered by the defendants. He handed down an opinion which he adopted as findings of fact and conclusions of law under Rules 41(b) and 52(a), Fed.R.Civ.Proc.[2] In essence, the Court held that there was no constitutional duty incumbent upon the Board to balance the races in the public school system, and that there was a failure of proof on the part of the plaintiffs to establish a policy of segregation or gerrymandering on the part of the Board.

**Was There A Constitutional Duty On The Part Of The Board To Balance The Races In The Cincinnati Public Schools Where The Imbalance Was Not Caused By Any Act Of Discrimination On Its Part?**

At the outset it should be pointed out that the State of Ohio abolished segregation in the public schools on February 22, 1887, which was more than 67 years before the United States Supreme Court barred it on constitutional grounds in the momentous decision of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).[3]

The so-called neighborhood plan for the location of public schools is authorized by statute under which Ohio School Boards are required to—

" * * * provide for the free education of the youth of school age within the district under its jurisdiction, at such places as will be convenient for the attendance of the largest number thereof." Ohio Rev. Code § 3313.48

We think the legislature had the power to enact this statute. The Cincinnati Board of Education has complied with it.

Appellants contend that the maintenance of a public school system in which racial imbalance exists is a violation of their constitutional right to the equal protection of the law. They assert that because the Negro student population is not spread uniformly throughout the Cincinnati school system, without a showing of deliberate discrimination or even racial classification, there is a duty of constitutional dimensions imposed on the school officials to eliminate the imbalance. Appellants claim that it is harmful to Negro children to attend a racially imbalanced school and this fact alone deprives them of equal educational opportunity.

The essence of the Brown decision was that the Fourteenth Amendment does not allow the state to classify its citizens differently solely because of their race. While the detrimental impact of compulsory segregation on the children of the minority race was referred to by the

---

that schools be located where they will be most convenient for the largest number of students.

"The Board is willing to make race of students one of the elements to be considered in the establishment of school attendance zone lines so long as this can be done consistently with the neighborhood school policy, the requirements of Section 3313.48, and the numerous factors which have always been considered in establishing such zone lines as— safety of children, travel distance and capacity of school.

"(2) The Board does not accept the concept of de facto segregation and will not agree to any proposal to bus students, to transfer classes or any other

program to attempt to balance races as such."

2. Deal v. Cincinnati Board of Education, 244 F.Supp. 572 (S.D.Ohio 1965).

3. 84 Ohio Laws 34, enacted Feb. 22, 1887. The Supreme Court of Ohio upheld and enforced the law in the following year, Board of Education v. State, 45 Ohio St. 555, 16 N.E. 373 (1888).

The Cincinnati school system discontinued compulsory segregation promptly after the enactment of this Ohio Statute in 1887. Since that time Negro students have had the opportunity to attend the neighborhood schools in Cincinnati on the same basis as white students living in the same localities.

Court, it was not indispensable to the decision. Rather, the Court held that segregation of the races was an arbitrary exercise of governmental power inconsistent with the requirements of the Constitution.

■ A finding of educational or other harm is not essential to strike down enforced segregation. This is shown by many subsequent cases nullifying separate facilities of all kinds with no evidence of harm.

In summarizing this principle, the Court said that classifications based on race violate the Fourteenth Amendment because they are obviously invidious and irrelevant. Goss v. Board of Education, 373 U.S. 683, 687, 83 S.Ct. 1405, 10 L.Ed. 2d 632 (1963).

Thus it is not necessary that a victim of racial discrimination prove that he was harmed in any specific material sense in order to invalidate state-imposed racial distinctions. See Johnson v. State of Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963) (seating in courtrooms); Watson v. City of Memphis, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) (municipal parks); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (restaurants in public buildings); Dawson v. Mayor and City Council of Baltimore, 220 F.2d 386 (4th Cir. 1955) aff'd 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955) (public beaches and bathhouses).

In Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), which is a companion case to *Brown*, and which involved the validity of school segregation in the District of Columbia, the Court held that the Fifth Amendment was violated. The Court emphasized that it was the fact of discriminatory classification by the government that violated the Constitution, and looked no further for evidence of educational or psychological injury, saying—

"Classifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect." Bolling v. Sharpe, supra, at 499, 74 S.Ct. at 694.

■■ The principle thus established in our law is that the state may not erect irrelevant barriers to restrict the full play of individual choice in any sector of society. Since it is freedom of choice that is to be protected, it is not necessary that any particular harm be established if it is shown that the range of individual options had been constricted without the high degree of justification which the Constitution requires. It is harm enough that a citizen is arbitrarily denied choices open to his fellows.

■ Conversely, a showing of harm alone is not enough to invoke the remedial powers of the law. If the state or any of its agencies has not adopted impermissible racial criteria in its treatment of individuals, then there is no violation of the Constitution. If factors outside the schools operate to deprive some children of some of the existing choices, the school board is certainly not responsible therefor.

Appellants, however, argue that the state must take affirmative steps to balance the schools to counteract the variety of private pressures that now operate to restrict the range of choices presented to each school child. Such a theory of constitutional duty would destroy the well-settled principle that the Fourteenth Amendment governs only state action. Under such a theory, all action would be state action, either because the state itself had moved directly, or because some private person had acted and thereby created the supposed duty of the state to counteract any consequences.

■ The standard to be applied is "equal educational opportunity". The Court in *Brown* cast its decision thus because it recognized that it was both unnecessary and impossible to require that each child come through the complex process of modern education with the same end result. This approach grants due respect for the unavoidable conse-

quences of variations in individual ability, home environment, economic circumstances, and occupational aspirations. Equal opportunity requires that each child start the race without arbitrary official handicaps; it does not require that each shall finish in the same time.

Appellants, however, pose the question of whether the neighborhood system of pupil placement, fairly administered without racial bias, comports with the requirements of equal opportunity if it nevertheless results in the creation of schools with predominantly or even exclusively Negro pupils. The neighborhood system is in wide use throughout the nation and has been for many years the basis of school administration. This is so because it is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children in reaching school, economy of cost in reducing transportation needs, ease of pupil placement and administration through the use of neutral, easily determined standards, and better home-school communication. The Supreme Court in *Brown* recognized geographic districting as the normal method of pupil placement and did not foresee changing it as the result of relief to be granted in that case. Brown v. Board of Education, 347 U.S. 483, 495 note 13, question 4(a), 74 S.Ct. 686, 98 L.Ed. 873; Brown v. Board of Education, 349 U.S. 294, 300–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). But see Blocker v. Board of Education of Manhasset, 226 F.Supp. 208, 221–222 (E.D.N.Y.1964).

Because of factors in the private housing market, disparities in job opportunities, and other outside influences, (as well as positive free choice by some Negroes), the imposition of the neighborhood concept on existing residential patterns in Cincinnati creates some schools which are predominantly or wholly of one race or another. Appellants insist that this situation, which they concede is not the case in every school in Cincinnati, presents the same separation and hence the same constitutional violation condemned in *Brown*. We do not accept this contention. The element of inequality in *Brown* was the unnecessary restriction on freedom of choice for the individual, based on the fortuitous, uncontrollable, arbitrary factor of his race. The evil inherent in such a classification is that it fails to recognize the high value which our society places on individual worth and personal achievement. Instead, a racial characterization treats men in the mass and is unrelated to legitimate governmental considerations. It fails to recognize each man as a unique member of society.

■■ In the present case, the only limit on individual choice in education imposed by state action is the use of the neighborhood school plan. Can it be said that this limitation shares the arbitrary, invidious characteristics of a racially restrictive system? We think not. In this situation, while a particular child may be attending a school composed exclusively of Negro pupils, he and his parents know that he has the choice of attending a mixed school if they so desire, and they can move into the neighborhood district of such a school. This situation is far removed from *Brown*, where the Negro was condemned to separation, no matter what he as an individual might be or do. Here, if there are obstacles or restrictions imposed on the ability of a Negro to take advantage of all the choices offered by the school system, they stem from his individual economic plight, or result from private, not school, prejudice.[4] We read *Brown* as prohibiting only enforced segregation.

4. The District Court correctly excluded evidence of alleged discrimination in the public and private housing markets. Such discrimination is caused, if in fact it does exist, by persons who are not parties to this case and the Board has no power to rectify that situation. If appellants have any valid claim for infringement of their rights by public housing or urban renewal officials, they may obtain appropriate relief against them under the Fourteenth Amendment. With respect to private ac-

The School Board, in the operation of the public schools, acts in much the same manner as an administrative agency exercising its accumulated technical expertise in formulating policy after balancing all legitimate conflicting interests. If that policy is one conceived without bias and administered uniformly to all who fall within its jurisdiction, the courts should be extremely wary of imposing their own judgment on those who have the technical knowledge and operating responsibility for the educational system. Thus, whereas such a geographical principle might be totally unacceptable in the administration of facilities such as beaches, parks, restaurants, or golf courses (see desegregation cases cited above), the school system presents problems of an altogether different nature and the fair minded judgment of the school officials is entitled to full consideration in determining whether freedom of choice has been preserved for the children within the limits necessary for effective educational practice. See Watson v. City of Memphis, supra, 373 U.S. at 531–532, 83 S.Ct. 1314.

We hold that there is no constitutional duty on the part of the Board to bus Negro or white children out of their neighborhoods or to transfer classes for the sole purpose of alleviating racial imbalance that it did not cause, nor is there a like duty to select new school sites solely in furtherance of such a purpose.

The bussing of pupils away from the neighborhoods of their residences may create many special problems for boards of education. These include the providing of adequate transportation and proper facilities and personnel for the supervision, education and well being of *all* pupils. All of this must be accomplished within the Board's budget.

Although boards of education have no constitutional obligation to relieve against racial imbalance which they did not cause or create, it has been held that it is not unconstitutional for them to consider racial factors and take steps to relieve racial imbalance if in their sound judgment such action is the best method of avoiding educational harm. Balaban v. Rubin, 14 N.Y.2d 193, 250 N.Y.S.2d 281, 199 N.E.2d 375 (1964), cert. denied 379 U.S. 881, 85 S.Ct. 148, 13 L.Ed.2d 87 (1964); Morean v. Board of Education of Montclair, 42 N.J. 237, 200 A.2d 97 (1964).

"The tenor of these and related decisions * * * clearly indicates that the Fourteenth Amendment, while prohibiting any form of invidious discrimination, does not bar cognizance of race in a proper effort to eliminate racial imbalance in a school system." Offermann v. Nitkowski, 248 F.Supp. 129, 131 (W.D.N.Y.1965).

In dealing with the multitude of local situations that must be considered and the even greater number of individual students involved, we believe it is the wiser course to allow for the flexibility, imagination and creativity of local school boards in providing for equal opportunity in education for all students. It would be a mistake for the courts to read *Brown* in such a way as to impose one particular concept of educational administration as the only permissible method of insuring equality consistent with sound educational practice. We are of the view that there may be a variety of permissible means to the goal of equal opportunity, and that room for reasonable men of good will to solve these complex community problems must be preserved. See Freund, Civil Rights and the Limits of the Law, 14 Buffalo L.Rev. 199, 205 (1964).

Moreover, our refusal to restrict the school board with a mathematically certain formula for the vindication of individual constitutional rights is not an innovation. The right to a trial by an impartial, fairly selected jury, is well

---

tions amounting to discriminatory practice, while there is no federal constitutional right available to appellants, they may seek relief from the state Civil Rights Commission or in the state courts, if relief is denied, under the provisions of the Ohio Fair Housing Law. Ohio Rev. Code § 4112.01–.07.

established in our law and it has been protected against the same sort of disguised racial discrimination that has been attempted in the school desegregation cases. Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Ex parte State of Virginia, 100 U.S. 339, 25 L.Ed. 676 (1879); Strauder v. State of West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879).

However, it is equally clear that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which is to try him nor on the venire or jury roll from which petit jurors are to be chosen. Swain v. State of Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed. 2d 759 (1965); Akins v. State of Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945). While the two situations may not be completely analogous, the potential dangers to a criminal defendant forced to face a racially imbalanced jury, are at least as great as the intangible, often speculative injuries threatening a student in a racially imbalanced school. The cases recognize that the calculus of equality is not limited to the single factor of "balanced schools"; rather, freedom of choice under the Fourteenth Amendment is a function of many variables which may be manipulated differently to achieve the same result in different contexts.

If the separation in imbalanced schools is the result of racial discrimination, the officials must take steps to remedy the situation. However, the Constitution does not prescribe any single particular cure, and the mere fact of imbalance alone is not a deprivation of equality in the absence of discrimination.

Two other Circuits have considered this question and have come to the same conclusion. Downs v. Board of Education of Kansas City, 336 F.2d 988 (10th Cir. 1964), cert. denied 380 U.S. 914, 85 S.Ct. 898, 13 L.Ed.2d 800 (1965);

Bell v. School, City of Gary, 324 F.2d 209 (7th Cir. 1963), cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964). See also Springfield School Comm. v. Barksdale, 348 F.2d 261, 264 (1st Cir. 1965).

Appellants rely on several decisions which they contend establish the constitutional invalidity of imbalanced schools. However, it would seem that these cases do not go that far. In each of them there was an added element which transmuted mere separation into segregation, difference into discrimination. This is in accord with our holding that bare statistical imbalance alone is not forbidden. There must also be present a quantum of official discrimination in order to invoke the protection of the Fourteenth Amendment.

In Taylor v. Board of Education of City School Dist. of New Rochelle, 294 F.2d 36 (2nd Cir. 1961), cert. denied 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), the Court of Appeals characterized as "crucial" the District Court's finding that the defendant School Board has deliberately created and maintained a segregated school, saying at page 39:

"In short, race was made the basis for school districting, with the purpose and effect of producing a substantially segregated school."

This situation, where affirmative gerrymandering of school districts had been accomplished and maintained with the motive of separating the races, was found to go "beyond *mere* imbalance" (emphasis added). This latter language clearly indicates that the Court's theory was one of "imbalance plus". See also Kaplan, Segregation, Litigation and the Schools: The New Rochelle Experience, 58 Nw.U.L.Rev. 1 (1963).

Appellants place much emphasis on Dowell v. School Board of Oklahoma City Public Schools, 244 F.Supp. 971 (W.D.Okl.1965), but we are unable to adapt that case to the problem of racial imbalance. Despite appellants' assertion that the District Court in *Dowell* dealt with facts similar to those in the case

before us, it is clear that it did not. In that case the problem was one of initial desegregation of a school system which had previously been organized along the dual racial lines condemned by *Brown*. The Court was explicit in this respect:

> "This case does not raise issues regarding a school board's constitutional duty to correct racial imbalance in localities where there is no prior history of segregation, or where prior racial policies are deemed corrected." (pp. 980–981)

Further, it is clear that the duty of a school board in first imposing a neighborhood districting system where none was used before, is different from that where the system has been used for many years and the imbalance in the schools is the result of population mobility among the various neighborhoods. In *Dowell*, the Court noted that the relative immobility of the Negro residents was used by the school board in separating them through the neighborhood policy, while in Cincinnati one of the primary causes of imbalance has been the rapid movement of the Negro population into different areas of the city. Thus, the problem in *Dowell* was far closer to the gerrymandering in *Taylor* than to anything in the classic statistical imbalance cases in northern cities.

Finally, in the one case in which a district Court apparently accepted the appellants' theory of racial imbalance, Barksdale v. Springfield School Comm., 237 F.Supp. 543 (D.Mass.1965), the First Circuit, in vacating the decision and dismissing the complaint without prejudice specifically rejected any such asserted constitutional right. Springfield School Comm. v. Barksdale, 348 F.2d 261, 264 (1st Cir. 1965).

Appellants' right to relief depends on a showing of more than mere statistical imbalance in the Cincinnati schools. They must also expose that added quantum of discriminatory state action which deprives them of their constitutional right to freedom of choice. If the school officials, through overt practice or by subterfuge, have treated students differently solely because of race, then they not only must cease doing so, but also must take affirmative action to remedy the condition which they have caused. Thus, even if the Negro students were distributed uniformly in the schools, if other forms of discrimination were used against them they would still be entitled to the aid of the law. When no discrimination is shown, racial imbalance alone is no warrant for relief.

### Did The Board of Education Intentionally Cause Racial Imbalance In The Cincinnati Public Schools, Deprive Negro Children Of Equal Educational Opportunities, And Discriminate Against Negroes In The Hiring And Assignment Of Teachers?

In their "Statement of Questions Involved" appellants assert that they have sufficiently shown that the Board of Education has *intentionally* caused, and then failed to eliminate, serious racial imbalance in the Cincinnati public schools, has afforded Negro children who are confined to segregated schools, inferior educational programs and facilities, and has provided school faculties and personnel which reflect the racial patterns of students. They state that children who attend racially imbalanced schools suffer injury constituting a denial of equal educational opportunity.

 The findings of fact of the District Court assume significance in our review of this phase of the case. Under Rule 52(a) the court was required to find the facts specially. The findings should be both "comprehensive and pertinent to the issues to provide a basis for decision." Schilling v. Schwitzer-Cummins Co., 79 U.S.App.D.C. 20, 142 F.2d 82, 84 (1944); Shapiro v. Rubens, 166 F.2d 659 (7th Cir. 1948). In meeting this standard, the District Courts are not required to prepare elaborate find-

ings on every possible issue or contention raised at trial. However, there must be subsidiary findings to support the ultimate conclusions of the court. Kelley v. Everglades Drainage District, 319 U.S. 415, 420, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943); Dearborn Nat'l Cas. Co. v. Consumers Petroleum Co., 164 F.2d 332, 333 (7th Cir. 1947). See also Townsend v. Benavente, 339 F.2d 421 (9th Cir. 1964). But see Gay Games, Inc. v. Smith, 132 F.2d 930, 931 (7th Cir. 1943).

At the trial level this case confronted the District Court with an enormous amount of evidence in the form of detailed maps, charts, statistical tables, sociological studies, and historical accounts, in addition to a substantial amount of oral testimony, expert and otherwise. To his credit, the District Judge succeeded to a great degree in expediting the trial through the extensive use of many stipulations and effective pre-trial procedures, which sharpened the issues. However, in his opinion he adopted as fair the following statement taken verbatim from the School Board's brief:

"The Cincinnati Public School System includes a number of schools which are attended almost entirely by Negro pupils, a number of schools attended entirely by white pupils, and a number of schools attended by both Negro and white pupils in various percentages of each of the races; the racial composition of each school is simply a result of the racial composition of the neighborhoods which they serve."

Then, after discussing the issue of imbalance, he stated:

"Their [appellants'] failure to produce evidence to establish a policy of segregation or gerrymandering on the part of defendants strongly suggests that such practices have not been engaged in. It is here found that plaintiffs have failed to establish a deprivation of rights under the law or under the Constitution of the United States by the requisite degree of proof * * *."

In dealing with the issue of discrimination in the context of a great metropolitan educational complex, these general findings do not present an adequate basis for review by this Court.

The District Court's finding on the racial composition of the schools in Cincinnati reveals that the schools are indeed racially imbalanced. In other words, the Negro student population is not spread uniformly among the individual schools, mainly because of the operation of the neighborhood school policy in conjunction with the residential concentration of Negroes in some areas. As the District Court held, and we affirmed above, this fact by itself gives rise to no relief. However, the crucial fact to be found is whether the racial imbalance was intentionally caused by gerrymandering or by other alleged discriminatory practices on the part of the Board. On that point the District Judge said only that appellants had failed to produce evidence to establish gerrymandering or other discriminatory practice and that this failure strongly suggested that such practices did not exist. Such a general finding must be supported by subsidiary findings of fact. Kelley v. Everglades Drainage District, supra.

Appellants, through extensive use of discovery techniques, adduced vast quantities of information concerning matters such as alleged discrimination in school attendance zoning, transportation policies, teacher selection and assignment, comparative test results, and policies on transfers and overcrowding of students. Some of their contentions with respect thereto are answered by appellees on appeal here, but some are not. This is due partly to the truncated status of the case at the time of the District Court's decision on the motion to dismiss, and partly because the Court considered only appellants', and not the School Board's, evidence in ruling on the motion.

An example of such unanswered and unaccounted for situations is the districting of the Sawyer Junior High School where the enrollment is mostly Negro. The fact is that its boundaries exclude children who live across the street from it in a largely white neighborhood. The School Board in its brief offered no explanation for this situation or for the selection of the Sawyer site so close to the existing Withrow Junior High School.

■■■ We have stated above that a showing of impairment of a Negro student's capacity to learn, arising from his school's racial imbalance, does not, standing alone, make out a case of constitutional deprivation. Evidence of such harm, however, may indeed be relevant to the issues of the case before us. Appellants offered expert evidence on this subject. The School Board offered no opposing expert testimony, no doubt because the Court granted the Board's motion to dismiss, made at the close of plaintiffs' proofs. Our review would be helped by a finding as to whether the District Judge considered plaintiffs' expert testimony of such relevance, weight or probative value as to make an issue calling for rebuttal proof by defendant.

No findings were made on these disputed issues. Without findings we are unable to determine whether discrimination existed with respect to specific schools and programs.

Other errors have been asserted which, in the light of our other holdings, we deem insubstantial.

The judgment of the District Court is affirmed on the issue of racial imbalance not intentionally caused by the Board, and the case is remanded for further findings on the issues of claimed discrimination in specific schools and programs and claimed harm to Negro students, allegedly caused by racially imbalanced schools, and for the taking of such additional relevant evidence as either party may offer. Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 663–664 (6th Cir. 1964).