Robert W. KELLEY et al. and Henry C. Maxwell, Jr., et al., Plaintiffs-Appellants,

v.

METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, et al., Defendants-Appellees.

No. 20741.

United States Court of Appeals, Sixth Circuit.

Dec. 18, 1970.

Avon N. Williams, Jr., Nashville, Tenn., for plaintiffs-appellants; Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, Sylvia Drew, New York City, Counsel of Record.

Robert E. Kendrick, Deputy Metropolitan Atty., Nashville, Tenn., for defendants-appellees.

Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.

EDWARDS, Circuit Judge.

This is an appeal from an order of the United States District Court for the Middle District of Tennessee, entered August 25, 1970. This order has the effect of staying all pupil desegregation proceedings in these long-pending cases until the decision of the school cases currently under consideration by the United States Supreme Court. Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 138 (4th Cir. 1970), cert. granted, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed. 2d 791 (1970); Charlotte-Mecklenburg Board of Education v. Swann, 431 F.2d 138 (4th Cir. 1970), cert. granted, 400 U. S. 862, 91 S.Ct. 101, 27 L.Ed.2d 102 (1970); Moore v. Charlotte-Mecklenburg Board of Education, 312 F.Supp. 503 (W. N.C.1970), prob. juris. noted, 400 U.S. 803, 91 S.Ct. 11, 27 L.Ed.2d 34 (1970); North Carolina State Board of Education v. Swann, 312 F.Supp. 503 (W.N.C. 1970), prob. juris. noted, 400 U.S. 804, 91 S.Ct. 11, 27 L.Ed.2d 34 (1970); McDaniel v. Barresi, 226 Ga. 456, 175 S.E. 2d 649 (1970), cert. granted, 400 U.S.

804, 91 S.Ct. 10, 27 L.Ed.2d 35 (1970); Davis v. Mobile County Board of School Commissioners, 420 F.2d 883 (5th Cir. 1970), cert. granted, 400 U.S. 804, 91 S.Ct. 11, 27 L.Ed.2d 43 (1970).

We are profoundly aware of the potential impact of the decisions anticipated in the cases cited above. But we believe the Supreme Court has plainly told us *not* to suspend efforts to disestablish racially separate school systems and to eliminate racial segregation "root and branch" [1] while awaiting decision on the ultimate question of to what degree such efforts must include racial balance in school districts.

In April of 1968 in a unanimous opinion the Supreme Court stated that the time to end dual school systems was "now."

"[A] plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. 'The time for mere "deliberate speed" has run out,' Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256; 'the context in which we must interpret and apply this language [of *Brown II,* Brown v. Board of Education of Topeka, Kan., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083] to plans for desegregation has been significantly altered.' Goss v. Board of Education of City of Knoxville, Tenn., 373 U.S. 683, 689, 83 S. Ct. 1405, 1409, 10 L.Ed.2d 632. *See* Calhoun v. Latimer, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now.*

"The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief." Green v. County School Board of Kent County, 391 U.S. 430, 438–439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

In October of 1969, again unanimously, and this time by brief per curiam, the Court declared:

"Under explicit holdings of this Court the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools. Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256 (1964); Green v. County School Board of New Kent County, 391 U.S. 430, 438–439, 442, 88 S.Ct. 1689, 1694–1695, 1696, 20 L.Ed.2d 716 (1968). Accordingly,

*It is hereby adjudged, ordered, and decreed:*

"1. The Court of Appeals' order of August 28, 1969, is vacated, and the case is remanded to that court to issue its decree and order, effective immediately, declaring that each of the school districts here involved may no longer operate a dual school system based on race or color, and directing that they begin immediately to operate as uni-

1. Green v. County School Board of Kent County, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

tary school systems within which no person is to be effectively excluded from any school because of race or color." Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969).

In still another brief and unanimous per curiam, the Supreme Court said on December 13, 1969:

"(2) By way of interim relief, and pending this Court's disposition of the petition for certiorari, the judgment of the Court of Appeals is vacated insofar as it deferred desegregation of schools until the school year 1970–1971.

"(3) By way of interim relief pending further order of this Court, the respondent school boards are directed to take no steps which are inconsistent with, or which will tend to prejudice or delay, a schedule to implement on or before February 1, 1970, desegregation plans submitted by the Department of Health, Education & Welfare for student assignment simultaneous with the other steps ordered by the Court of Appeals." Carter v. West Feliciana Parish School Board, 396 U.S. 226, 228, 90 S.Ct. 467, 469, 24 L.Ed.2d 382 (1969).

Much more recently the Supreme Court has twice refused to delay the integration proceedings in the principal case now under the consideration of that court. Swann v. Charlotte-Mecklenburg Board of Education, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791 (1970), and the unpublished Order by the Chief Justice, dated August 25, 1970, denying on behalf of the Court the Application for Stay of an Order of the United States District Court for the Western District of North Carolina, dated August 7, 1970. See also Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Carter v. West Feliciana Parish School Board, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969) (granting temporary injunctive relief); Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970).

Over and above these commands for action upon desegregation plans, it should be noted that what has actually been suspended in our instant case is not a broad federal court order for desegregation of Nashville & Davidson County Schools—in practical effect it is all proceedings and hearings concerning the formulation of such an order.

Further, the instant case is growing hoary with age. It is actually a consolidation of two cases. The first case, Kelley v. Board of Education of the City of Nashville, Civ. A. No. 2094, was filed in September of 1955; and the second case, Maxwell v. County Board of Education of Davidson County, Civ. A. No. 2956, was filed in September of 1960. A whole generation of school children has gone through the complete school system of Metropolitan Nashville in the intervening years under circumstances now determined to have been violative of their constitutional rights. A second generation of school children is now attending school under similar circumstances—and the remedy is not in sight.

The entire history of the school desegregation problem from Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), to date can be traced in this case in the lengthy proceedings in the District Court, in this Court, and in the United States Supreme Court.[2]

2. Kelley v. Board of Education of City of Nashville, 139 F.Supp. 578 (M.D.Tenn. 1956) (Dissolution of three-judge court); Kelly v. Board of Education of City of Nashville, 159 F.Supp. 272 (M.D.Tenn. 1958) (Disapproval of integration plan and grant to Board of additional time to file a new plan); Kelley v. Board of Education of City of Nashville, 8 R.R.L.R. 651 (M.D.Tenn.1958) (Approval of 12-year plan); Kelley v. Board of Education of City of Nashville, 270 F.2d 209 (6th Cir. 1959) (Upholding District Court order); Kelley v. Board of Education of City of Nashville, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959) (Denial of certiorari); Maxwell v. County Board of Education of Davidson County, 203 F.Supp. 768 (M.D.Tenn.1960); Maxwell v. County Board of Education of Davidson

This case finally came close to decision in a careful opinion filed by the District Judge on July 16, 1970 and in the judgment entered by him on August 13, 1970, requiring the Nashville Board of Education to submit a desegregation plan for the court's consideration and approval, all pursuant to the decisions of the United States Supreme Court previously referred to in this opinion. Brown v. Board of Education, *supra*; Alexander v. Holmes County Board of Education, *supra*; Green v. County School Board of Kent County, *supra*, and Carter v. West Feliciana Parish School Board, *supra*.

It would be well for those in authority in Nashville and Davidson County to read the able opinion of Judge Miller, which we now revitalize by our present order. The emphasis in the quotation which follows is that of this court:

"[I]t is the Court's view that in the area of school zoning, school boards will fulfill their affirmative duty to establish a unitary school system only if attendance zone lines are drawn in such way as to maximize pupil integration. In drawing such lines, the defendant school board may properly consider in the total equation such factors as capacities and locations of schools, physical boundaries, transportation problems, and cost; however, none of these considerations can supersede the importance of the primary goal of maximizing integration.

"In looking to the facts of this case, the Court finds that many of the elementary and secondary school zone lines in the Nashville and Davidson County School System[4] have not been drawn so as to minimize integration. *With the exception of zone lines drawn for new schools, the zone lines currently in existence were drawn prior to Brown v. Board of Education with the aim of maintaining segregation.* Though there has been some black population migration to formerly white areas, in large part *these zone lines continue to serve quite well the segregative purpose for which they were originally established.* The truth of this statement is made manifest when one examines the racial make-up of the pupil population in areas containing several contiguous attendance zones. In East Nashville, for example, there is a cluster of five elementary schools having contiguous attendance zones.[5] Of these five schools, white pupils are in the great majority in four schools, Baxter, Dalewood, Rosebank, and Bailey, while black students are in the majority in one of the schools, Inglewood.[6] As a reference to the zone may will indicate, Inglewood is completely surrounded by the four predominantly white schools, and the Inglewood zone is drawn to enclose most of the black population living in the five school area. Defendants argue that they are applying the 'neighborhood' concept in the drawing of elementary school zone lines. *If such a concept is indeed being applied in this five school area, it appears to the Court that it is being applied solely to perpetuate segregation.*

County, 301 F.2d 828 (6th Cir. 1962), reversed in part and remanded sub nom. Goss v. Board of Education of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); Kelley v. Board of Education of Nashville and Davidson County, 293 F.Supp. 485 (M.D.Tenn.1968) (Further proceedings in a consolidation of *Maxwell, supra,* and *Kelley, supra*).

4. The Metropolitan School System had a total enrollment of 95,789 pupils for the 1969-70 school year. Currently, 81% of all white pupils are attending schools that are over 90% white, while 62% of all black pupils attend schools that are over 90% black. Exclusive of special education facilities, there are 139 schools in the system.

5. *See* Map No. 1 in Appendix.

6. Enrollment figures, with racial breakdowns,* for the five schools are as follows:

|  | W | B | %B |
|---|---|---|---|
| Baxter | 544 | 69 | 11 |
| Dalewood | 589 | 30 | 5 |
| Rosebank | 602 | 0 | 0 |
| Inglewood | 254 | 378 | 60 |
| Bailey | 629 | 78 | 11 |

* Based on plaintiff's exhibit No. 3.

*Defendants contend that one of the prime advantages of 'neighborhood' schools is that they allow pupils to walk to and from school. If this is true, it is difficult to see why black pupils who live closer to Baxter or Bailey schools, for instance, are required to walk the greater distance to attend Inglewood school.*

"The same pattern is repeated in a seven school area in south and west Nashville. In this situation, the attendance zones for Ransom and Eakin schools are contiguous with the attendance zones for Ford, Greene, Head, Carter Lawrence, Murrel and Clemons schools. The former two schools are almost completely white, while the latter five schools are almost totally black.[7] Once again it appears that the zone lines as drawn insure that white neighborhoods will have white schools and black neighborhoods will have black schools. *As the above two illustrations make clear, by maintaining the old dual school zones, defendant has encouraged continued segregation rather than significant integration in the elementary schools.*

"Turning to junior high school zones, the Court finds much the same situation as in the elementary schools. Though the 'neighborhood' concept is not applied in secondary school zoning, junior high school zones are drawn so that each school serves a particular residential area or 'service area' as it is sometimes referred to by defendant. These service areas cover a broader geographic area than a single neighborhood, for several elementary schools within their respective neighborhood zones feed graduating students into the junior high school within whose zone they lie. This process is generally described in terms of a 'feeder pattern.' Once again, a look at the existing zone lines convinces the Court that the junior high school attendance zones and the 'feeder patterns' which graduate elementary students into the junior high schools are structured so as to foster for the most part continued segregation or at best only token integration. *It is apparent that the zone lines as presently drawn are designed to provide racially identifiable 'black' schools for black residential areas and 'white' schools for white residential areas.* For example, looking at a cluster of six contiguous junior high school zones, the Court finds that Bass, West End, and Moore Junior high schools are all predominantly white schools with their attendance zones being drawn so as to correspond significantly with white residential areas. On the other hand, Washington, Rose Park and Waverly-Belmont are all racially identifiable as black schools and their attendance zones have been drawn in a manner effectively to prevent a significant number of black pupils from attending school outside of the black residential area.[8]

*"Finally, looking to the high school zones, there is similar evidence of continued duality in the school system.* For example, of five contiguous high school zones, three of the schools, Cohn, Hillsboro and Central, are racially identifiable as white schools. Their attendance zone lines form the boundary line between the predominantly white residential areas in south and west Nashville and the black residential areas to the north and east. These black areas

---

7. See Map No. 2 in Appendix and note the following figures * on the enrollment of these schools:

| | W | B | %B |
|---|---|---|---|
| Ford Greene | 0 | 887 | 100 |
| Head | 0 | 791 | 100 |
| Carter Lawrence | 0 | 516 | 100 |
| Murrel | 0 | 328 | 100 |
| Clemons | 51 | 519 | 90 |
| Ransom | 355 | 2 | 1 |
| Eakin | 487 | 5 | 1 |

* Based on plaintiff's exhibit No. 3.

8. *See* Map No. 3 in Appendix and note the following figures: *

| | W | B | %B |
|---|---|---|---|
| Bass | 777 | 12 | 2 |
| West End | 578 | 40 | 6 |
| Moore | 999 | 85 | 8 |
| Washington | 0 | 1,347 | 100 |
| Rose Park | 11 | 527 | 98 |
| Waverly-Belmont | 26 | 260 | 91 |

* Based on plaintiff's exhibit No. 3.

are served by Cameron and Pearl high schools.[9]

"In connection with the segregative effect of present school zoning, it is interesting to note that while portable classrooms are in limited use in predominantly Negro schools, approximately 117 portables are in use in racially identifiable white schools. These predominantly Negro schools, on the basis of their rated maximum capacities, have approximately 5,400 vacancies, yet the white schools, in zones tailored to white residential sections, are overcrowded. It would seem that rezoning could serve the dual purpose of alleviating this overcrowding and, at the same time, promoting the goal of integration.

*"It is the Court's conclusion that defendant's current policy of attendance zoning does not facilitate rapid conversion from a dual to a unitary school system. As is evident from the foregoing discussion, the zone lines as they presently exist foster continued segregation in many instances.*[10] *Corresponding as they do to racial residential patterns, it is difficult to envision any other result. Historic zone lines which purposely promote segregation must be altered. In making such alterations defendant board should take those steps 'which promise realistically to convert promptly to a system without a "white" school and a "Negro" school, but just schools.'* Green v. County School Board of New Kent County, *supra* [391 U.S. 430] at 442, [88 S.Ct. 1689, 20 L.Ed. 2d 716].

\* \* \* \* \* \*

"It should be made clear at this point that the compulsory bussing of pupils to achieve any sort of mathematically ideal racial balance is not required by decisions of the Supreme Court. *See* North-cross v. Memphis City Schools Board of Education, *supra* [397 U.S. 232] at 237, [90 S.Ct. 891, 25 L.Ed.2d 246] (C. J. Burger's concurrence); Deal v. Cincinnati Board of Education, *supra*, 419 F.2d 1387; Beckett v. School Board of City of Norfolk, 308 F.Supp. 1274 (E.D.Va. 1969). Accordingly, this Court exacts no such requirement of defendant. The extent and proper use of bussing of students is a matter that addresses itself to the sound judgment and discretion of the school board so long as its purpose and effect are not to foster segregation. *All that is required of defendant in the area of zoning is that it take affirmative action to maximize integration in all feasible ways so as to promote the immediate establishment of a unitary school system."* (Emphasis added.) (Footnotes in original.)

It should be noted that the last paragraph of Judge Miller's opinion makes it unnecessary for this court in this case (or the District Court on remand) to seek to anticipate the outcome of the "racial balance" problem which we have noted above to be pending decision in the United States Supreme Court. We read Judge Miller's last quoted sentence as the unanimous and minimum view of all members of the United States Supreme Court and indisputably the law of this land.

With this opinion before it, the Metropolitan Board of Education did as required by the District Judge's order of August 13, 1970, submit a proposed plan. That School Board plan is not currently at issue before this court, since (because of the stay order of August 25) it has never been heard or acted upon by the District Court. But the United States District Judge who will hear this case on remand should be able readily to make a

9. *See* Map No. 4 in Appendix and note the following figures:

| | W | B | %B |
|---|---|---|---|
| Cohn | 960 | 45 | 4 |
| Hillsboro | 1,223 | 15 | 1 |
| Central | 899 | 203 | 18 |
| Pearl | 1 | 1,308 | 100 |
| Cameron | 0 | 1,212 | 100 |

10. Of the 139 regular schools in the system in 1969–70, 88 had less than 10% black enrollment, 22 had 10% to 40% black enrolling (with the total enrollment of these latter 22 schools constituting only 16% of the entire metropolitan school enrollment), and, finally 29 schools had more than 40% black enrollment. A clear racial pattern is present.

judgment as to whether the plan proposed was good-faith compliance with the guidelines set forth by Judge Miller or whether it was designed to evade and frustrate the constitutional purposes expounded therein.

The District Judge's powers in dealing with either alternative have been clearly delineated by the Supreme Court. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970).

■ It is clear to us that the rights of school children to schooling under nondiscriminatory and constitutional conditions cannot be recaptured for any school semester lived under discrimination practices. Nor can any court thereafter devise an effective remedial measure. Therefore, we have no doubt that the District Court order of August 25, 1970, staying pupil integration proceedings for an indefinite time was final and is appealable under 28 U.S.C. § 1291. United States v. Lynd, 301 F.2d 818 (5th Cir.), cert. denied, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125 (1962); Harris v. Gibson, 322 F.2d 780 (5th Cir. 1963), cert. denied, 376 U.S. 908, 84 S.Ct. 661, 11 L.Ed.2d 606 (1964).

This view is, we believe, entirely consistent with settled doctrine of the United States Supreme Court. Dealing generally with the "final" order issue, the Supreme Court has said:

"Under § 1291 an appeal may be taken from any 'final' order of a district court. But as this Court often has pointed out, a decision 'final' within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case. Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 545, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528. And our cases long have recognized that whether a ruling is 'final' within the meaning of § 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality. Because of this difficulty this Court has held that the requirement of finality is to be given a 'practical rather than a technical construction.' Cohen v. Beneficial Industrial Loan Corp., supra, 337 U.S., at 546, 69 S.Ct. 1226. See also Brown Shoe Co. v. United States, 370 U.S. 294, 306, 82 S.Ct. 1502, 1513, 8 L.Ed.2d 510; Bronson v. LaCrosse & M. Railroad Co, 67 U. S. 524, 2 Black 524, 531, 17 L.Ed. 347, 359; Forgay v. Conrad, 47 U.S. 201, 6 How. 201, 203, 12 L.Ed. 404. Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299, pointed out that in deciding the question of finality the most important competing considerations are 'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.'" Gillespie v. United States Steel Corp., 379 U.S. 148, 152–153, 85 S.Ct. 308, 311, 13 L.Ed.2d 199 (1964).

We believe that "the danger of denying justice by delay" in this case is as clear as it was in Alexander, supra; Green v. County Board, supra, and Carter, supra.

■ We now vacate the stay of August 25, 1970, with the intention of leaving in full effect and operation the judgment of the District Court of August 13, 1970. The present District Judge should proceed immediately to hold the necessary hearings upon objections to the Board of Education plan and thereafter to approve or modify same as the record which is developed appears to require, and thereupon enter an order of implementation. The time schedule for consideration and implementation of this order should, of course, meet the "maximum" standard set forth by the Supreme Court in the second Carter case (Carter v. West Feliciana Parish School Board, 396 U.S. 290, 293, 90 S.Ct 608, 24 L. Ed.2d 477 (1970)). The District Court may, of course, require reports (including a pupil locator map) and recommendations (including those of expert witnesses and the Department of Health,

Education and Welfare) and consider them in its order of implementation.

Reversed and remanded for further proceedings consistent with this opinion and the decisions of the United States Supreme Court in Alexander v. Holmes County Board of Education, *supra*; Brown v. Board of Education, *supra*; Green v. County School Board of New Kent County, *supra*, and Carter v. West Feliciana Parish School Board, *supra*.

CELEBREZZE, Circuit Judge (concurring in part and dissenting in part).

I concur with the majority holding that this Court may review an order of a District Court which has the effect of staying pupil integration proceedings for an indefinite time. Further, I am appalled by the fact that since these suits were first brought to the attention of the judicial system, a whole generation of school children has gone through a school system which has been determined violative of their constitutional rights. And from a reading of the District Court's opinion, it is equally clear that Judge Miller also does not sanction any School Board policy which "does not facilitate rapid conversion from a dual to a unitary school system." Indeed, the District Court's stay in this case must be read in the context of its legal conclusions that the Appellee School Board must "take affirmative action to maximize integration in all feasible ways so as to promote the immediate establishment of a unitary system."

I depart from the majority decision in that I would not disturb the District Court's temporary stay pending the resolution of cases involving the same issues which are presently before the United States Supreme Court. Ordinarily, it is within the discretion of a federal court to delay the implementation of its judgments where a decision is to be handed down from a higher court which may affect the outcome of a pending case. Such discretionary power is analogous to the District Court's power to stay execution of a judgment pending an appeal.

See Rule 62, Federal Rules of Civil Procedure.

In the instant case, the District Court had before it the proposed plan of the School Board when it issued its temporary stay pending certain decisions of the United States Supreme Court. The District Court had expressed itself clearly on the current policy of the School Board and we can only infer that its subsequent stay was based on the District Court's belief that a final resolution of pupil integration would most rapidly be achieved by not enforcing the proposed School Board plan. Instead, the District Court chose to await decisions by the United States Supreme Court on a group of cases about which the majority concede they "are profoundly aware of the[ir] potential impact." In the absence of clear abuse, I would not disturb the District Court's exercise of its broad discretionary power to determine when a temporary stay is appropriate.