Cecil, Senior Circuit Judge, concurred and filed opinion.

**Donald DAVIS, Jr., a minor by his mother and next friend Mrs. Sadie Davis et al., Plaintiffs-Appellees,**

v.

**SCHOOL DISTRICT OF the CITY OF PONTIAC, INC., et al., Defendants-Appellants.**

**No. 20477.**

United States Court of Appeals, Sixth Circuit.

May 28, 1971.

Robert E. Manley, Cincinnati, Ohio, for defendants-appellants; Beirne, Wirthlin & Manley, Cincinnati, Ohio, on brief; Dudley & Patterson, by Harold W. Dudley and William R. Lightbody, Pontiac, Mich., of counsel.

Elbert L. Hatchett, Pontiac, Mich., for plaintiffs-appellees; William Waterman, Pontiac, Mich., on brief.

Before McCREE, Circuit Judge, CE-CIL, Senior Circuit Judge, and MUR-RAH,* Senior Circuit Judge.

McCREE, Circuit Judge.

This case presents the question whether the racial pattern which is manifested within the Pontiac, Michigan School District in pupil attendance zones, faculty and administrative assignments, and the locating of school buildings is the purposeful product of policies of the Board of Education. Plaintiffs-appellees are Negro children and residents of the City of Pontiac and of the State of Michigan. On February 20, 1969, they brought a class action in the United States District Court for the Eastern District of Michigan against the school district, its superintendent and assistant superintendents, and the seven members of its Board of Education. The complaint charges that defendants have drawn zone attendance lines and have selected new school construction sites with the purpose and effect of maintaining separate schools for Negro children, and that defendants also have limited the number of Negro employees working in the school system and have considered race in assigning teachers and administrators to schools in contravention of the Fourteenth Amendment to the Constitution of the United States.

On February 17, 1970, the District Court filed its opinion finding that the Pontiac Board of Education

* * * intentionally utilized the power at their disposal to locate new schools and arrange boundaries in such a way as to perpetuate the pattern of segregation within the City and thereby, deliberately, * * * prevented integration. * * * Where a Board of Education has contributed and played a major role in the development and growth of a segregated situation, the Board is guilty of *de jure* segregation. The fact that such came slowly and surreptitiously rather than by legislative pronouncement makes the situation no less evil. Davis v. School District of the City of Pontiac, 309 F.Supp. 734, 741–742 (E. D.Mich.1970).

With regard to faculty members and administrators, the court stated:

Just as there has been failure to implement pronounced policies regarding the elimination of segregation within the school body, so too has there been a failure to provide an integrated faculty or administration within the system. The fact that the Board employs Negro faculty members when the majority of those teachers are confined to Black schools, is indicative of a practice of following and indeed advancing the segregated characteristic of the schools. A review of the testimony and exhibits made

---

* The Honorable Alfred P. Murrah, Senior Judge, United States Court of Appeals, Tenth Circuit, sitting by designation.

available to the Court reveals that, historically, Black teachers have been and continue to be assigned to Black schools and white teachers assigned to white schools. The fact that the Board of Education has, in an attempt to deprive the plaintiffs of any complaint in this regard, assigned one or two Black teachers to all-white schools and, vice versa, is insufficient evidence that the problem is being corrected.

\*  \*  \*  \*  \*  \*

This Court could repeat here reams of testimony presented by the defendants to explain the situation in the teaching faculty which is presently found to exist. The record speaks for itself in this regard and warrants no magnified attention to reflect the discriminatory practices which continue to be followed in the Pontiac School System as to assignment of faculty and promotion of administrators. *Id.* at 742–743.

The court then ordered defendants to submit a plan for the integration of the school system at all levels—student body, faculty and administration. On April 2, 1970, the court approved a plan submitted by appellants, entered an order that the plan be implemented, and granted final judgment in favor of appellees.

Appellants correctly contend that under Deal v. Cincinnati Bd. of Educ., 369 F.2d 55 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L. Ed.2d 114 (1967), a school district has no affirmative obligation to achieve a balance of the races in the schools when the existing imbalance is not attributable to school policies or practices and is the result of housing patterns and other forces over which the school administration had no control. They also contend that the District Court's findings in this case compel the conclusion reached in *Deal* that the racial imbalance in the schools is not the result of improper discrimination by the school district. We disagree. In *Deal* this court stated that

\*  \*  \*  bare statistical imbalance alone is not forbidden. There must also be present a quantum of official discrimination in order to invoke the protection of the Fourteenth Amendment. 369 F.2d at 62.

The court below clearly indicated its awareness of that requirement and found in this case the quantum of discrimination sufficient to support an order to desegregate:

This Court acknowledges the recently enunciated position that a Board of Education has no affirmative duty to eliminate segregation when it has done nothing to create it, but this Court finds that the Pontiac Board of Education did a great deal to create the patterns presently existing within that school district and is now responsible to take action so as to eliminate the very situation which it caused. 309 F.Supp. at 742.

Accordingly, the principal question before us is whether there is sufficient evidence in the record to support the determination of the District Judge that appellants are responsible for the existing racial imbalance in the Pontiac School System. Appellants argue that schools have been constructed and attendance zones have been drawn in accordance with a neighborhood school concept without regard to race. They assert that, although the school district's policies were color blind prior to 1964, the Board of Education now affirmatively seeks to recruit black employees and to integrate pupils, teachers and administrators by using race as one of the criteria in determining attendance zones and assigning personnel. However, these same contentions were presented at trial and the District Court, while acknowledging recent efforts to improve the situation, nevertheless found the new policies inadequate to cure the effects of years of purposeful segregation. After a thorough review of the record on appeal, and upon consideration, we have concluded that the District Court's findings of purposeful segregation by the school district are sup-

ported by substantial evidence and are not clearly erroneous. Fed.R.Civ.P. 52 (a).

During the six-day trial, lengthy testimony was admitted concerning the policies and practices of the Pontiac school system, and numerous exhibits were introduced to illustrate the racial population patterns of the City of Pontiac and the development of school construction and attendance boundaries within the system. We observe, as did the District Court, that school location and attendance boundary line decisions, for the past 15 years, more often than not tended to perpetuate segregation. Attempted justification of those decisions in terms of proximity of school buildings, their capacity, and safety of access routes requires inconsistent applications of these criteria. Although, as the District Court stated, each decision considered alone might not compel the conclusion that the Board of Education intended to foster segregation, taken together, they support the conclusion that a purposeful pattern of racial discrimination has existed in the Pontiac school system for at least 15 years.

■ The court's finding that the school district's administration and faculty have been purposefully segregated finds even stronger support in the record. Appellants fail in their attempts to explain the obvious pattern of placement of black teachers and administrators almost exclusively in schools attended by black children. It is admitted that teacher placement procedures were changed in 1967 because the central office believed that principals were discriminatorily exercising their right to reject job applicants. We also observe that appellants' proposal to re-assign faculty members in the racial proportions of student bodies merely restates the Board's prior policy of personnel placement. Although the plan may result in a satisfactory level of faculty integration, the formula would not be consistent with nondiscriminatory assignment of personnel on a continuing

basis. As the District Court observed, the school district's obvious regard for race in assigning faculty members and administrators is a factor which may be considered in assessing motives underlying past decisions which resulted in segregation. United States v. School District 151 of Cook County, 301 F.Supp. 201, 229–230 (N.D.Ill.1969).

■ We also hold that the court properly fulfilled its duty to require the eradication of the effects of the past unlawful discrimination. As the Supreme Court stated in Green v. County School Bd. of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968):

We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future. 391 U.S. at 438 n. 4, 88 S.Ct. at 1694.

In Robinson v. Shelby County Bd. of Educ., 442 F.2d 255 (6th Cir., 1971); and Kelley v. Metropolitan County Bd. of Educ. of Nashville and Davidson County, 436 F.2d 856 (6th Cir., 1970), we quoted with approval the following statement by a District Court.

'Historic zone lines which purposely promote segregation must be altered. In making such alterations defendant board should take those steps "which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools." * * *

All that is required of defendant in the area of zoning is that it take affirmative action to maximize integration in all feasible ways so as to promote the immediate establishment of a unitary school system.

■■ Appellants now argue that the plan which they proposed and which the District Court adopted is impractical and would require the expenditure of large sums of money which may not be available. However, the only alternative "plan" also proposed by appellants is no

more than the reaffirmation of existing policies. Accordingly, we do not hold that the District Court abused its discretion in adopting appellants' comprehensive plan for the integration of the students and staff of the school system. It is initially the responsibility of the Board of Education to propose a feasible means of disestablishing existing segregation and eliminating its effects within the school system. Ordinarily, the court will not substitute its discretion for that of a board of education but will adopt a plan proposed by the board if it fulfills the board's duty to eliminate the effects of past illegal conduct. Robinson v. Shelby County Bd. of Educ., *supra*, 442 F.2d at 258.

The District Court's judgment and order are affirmed and the case is remanded for continuing supervisory jurisdiction over the desegregation of the school system. Because of the length of time which has passed since the entry of the District Court's order, and the possibility that some conditions have changed within the school system during that time, the court may, in its discretion, allow the parties to submit alternative plans or propose amendments to the adopted plan, or may consider such other relief as may be appropriate.

Affirmed.[1]

CECIL, Senior Circuit Judge. (concurring).

The American Public School System is one of the great institutions designed by man and the neighborhood concept of limited school districts for the purpose of attendance is a major element of strength of the institution. Busing students from one school building to another, particularly for the elementary grades, is out of harmony with the neighborhood concept of our public school system.

There is no legal requirement that there be a racial balance in every school nor is it required that students be bused back and forth from one part of a school system to another to achieve such a balance. The Court said in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 3, 91 S.Ct. 1267, 1270.

"The constitutional command to desegregate schools does not mean that every school in every community must

1. Before the issuance of this opinion, the United States Supreme Court handed down its decision in Swann v. Charlotte-Mecklenburg Bd. of Educ., 401 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (Nos. 281 and 349), and its companion cases. Those cases were primarily concerned with the extent of the duties of school authorities and the scope of the powers of federal courts to accomplish the desegregation of public schools where a segregated pattern was the consequence of state action. The Court stated that:

The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by *Brown I* as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of *Brown II*. That was the basis for the holding in *Green* that school authorities are "clearly charged with the affirmative duty to

take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U.S., at 437–438, 88 S.Ct. [1689] at 1694.

If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies. Swann v. Charlotte-Mecklenburg Bd. of Educ., *supra*, at 15, 91 S.Ct. at 1276.

We observe that the District Court's order in this case is consistent with these principles and is within the scope of its remedial powers as enunciated by the Court in the companion cases. *Accord*, Johnson v. San Francisco United School Dist. (N.D.Cal. April 28, 1971) (No. C–70 1331 SAW) (slip opinion).

always reflect the racial composition of the school system as a whole."

At p. 16, 91 S.Ct. at p. 1276, the Court said,

"School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; *absent a finding of a constitutional violation, however, that would not be within the authority of a federal court.*" (Emphasis added).

See also Deal v. Cincinnati Board of Education, 369 F.2d 55 (C.A.6) cert. den., 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114; Northcross v. Memphis City Schools Board of Education, 420 F.2d 546, aff., 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246. Nevertheless school authorities may not through a pattern of zoning and school construction create a situation that will result in racial segregation. The Court said in Swan, *supra,* at p. 20, 91 S.Ct. at pp. 1278–1279,

"* * * The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner city neighborhoods.

In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown,* closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight."

See also Kelly v. Metropolitan County Board of Education of Nashville, Tennessee, 436 F.2d 856 (C.A.6).

In the case before us the district judge made the following findings,

"This Court finds that the Pontiac Board of Education intentionally utilized the power at their disposal to locate new schools and arrange boundaries in such a way as to perpetuate the pattern of segregation within the City and thereby, deliberately, in contradiction of their announced policies of achieving a racial mixture in the schools, prevented integration. When the power to act is available, failure to take the necessary steps so as to negate or alleviate a situation which is harmful is as wrong as is the taking of affirmative steps to advance that situation. Sins of omission can be as serious as sins of commission. Where a Board of Education has contributed and played a major role in the development and growth of a segregated situation, the Board is guilty of a 'de jure' segregation. The fact that such came slowly and surreptitiously rather than by legislative pronouncement makes the situation no less evil." Davis v. School District

of Pontiac, Inc., 309 F.Supp. 734, 741–742.

As Judge McCree said in the opinion of the Court, these findings of purposeful segregation by the school district are supported by substantial evidence and are not clearly erroneous. Since the school authorities purposefully created a condition that resulted in segregation of races they must take such steps as are necessary to remedy the situation. If the remedy requires busing of students the school district must provide for such transportation. As the Court said in *Swan*, p. 30, 91 S.Ct. at p. 1283,

"\* \* \* In these circumstances, we find no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation."