463 F.2d 732
 Robert W. KELLEY et al., Henry C. Maxwell, Jr., et al.,
Plaintiffs-Appellees-Cross-Appellants,
v.
METROPOLITAN COUNTY BOARD OF EDUCATION OF NASHVILLE AND
DAVIDSON COUNTY, TENNESSEE, C. R. Dorrier,
Chairman, et al.,
Defendants-Appellants-Cross-Appellees.
 Nos. 71-1778, 71-1779.
 United States Court of Appeals,
 Sixth Circuit.
May 30, 1972.
 
 Avon N. Williams, Jr., Nashville, Tenn. (Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, Sylvia Drew, New York City, on the brief), for plaintiffs as appellees and cross-appellants.
 Dick L. Lansden, Nashville, Tenn. (Harlan Dodson, Jr., Hamilton Gayden, Jr., Nashville, Tenn., on the brief), for defendants as appellants and cross-appellees.
 K. William O'Connor, Civil Rights Div., Washington, D. C., for United States, amicus curiae.
 Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.
 EDWARDS, Circuit Judge.
 
 
 1
 In this case we do not write on a clean slate. What follows describes an incredibly lengthy record and settled law pertaining to segregated schools. We start with this latter, as recited in the United States Constitution and in three historic, unanimous decisions of the United States Supreme Court--the last dated 1971.
 
 
 2
 "[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.Const. Amend. XIV, Sec. 1.
 
 
 3
 We conclude that in the field of public education the doctrine of "separate but equal" has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. Brown v. Board of Education, 347 U. S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954).
 
 
 4
 [A] plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. "The time for mere 'deliberate speed' has run out," Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256; "the context in which we must interpret and apply this language [of Brown II] to plans for desegregation has been significantly altered." Goss v. Board of Education, 373 U.S. 683, 689, 83 S.Ct. 1405, 10 L.Ed.2d 632. See Calhoun v. Latimer, 377 U.S. 263, 84 S.Ct. 1235, 12 L.Ed.2d 288. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now. Green v. County School Board of Kent County, 391 U.S. 430, 438-439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
 
 
 5
 All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 28, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
 
 
 6
 After 17 years of continuous litigation the Metropolitan County Board of Education of Nashville and Davidson County, Tennessee, appeals from a final order of the United States District Court for the Middle District of Tennessee requiring the School Board to take the necessary steps to end the racially separated school systems which it had previously been found to be operating. This order was a direct result of an order of this court approving the District Court's findings of violations of equal protection and vacating a stay of proceedings. In it we had noted:
 
 
 7
 [T]he instant case is growing hoary with age. It is actually a consolidation of two cases. The first case, Kelley v. Board of Education of the City of Nashville, Civ.A. No. 2094, was filed in September of 1955; and the second case, Maxwell v. County Board of Education of Davidson County, Civ.A. No. 2956, was filed in September of 1960. A whole generation of school children has gone through the complete school system of Metropolitan Nashville in the intervening years under circumstances now determined to have been violative of their constitutional rights. A second generation of school children is now attending school under similar circumstances--and the remedy is not in sight. Kelley v. Metropolitan County Board of Education of Nashville, Tennessee, 436 F.2d 856, 858 (6th Cir. 1970).
 
 
 8
 The order of the District Judge is the first comprehensive and potentially effective desegregation order ever entered in this litigation. The District Judge tells us that now the remedy is at least in sight.
 
 THE APPELLATE ISSUES
 
 9
 On appeal defendants contend 1) that the District Court had no jurisdiction to hear and determine this case because of failure to comply with Rule 23 of the Federal Rules of Civil Procedure and because of changes in the status of the original party plaintiffs since the commencement of these suits; 2) that the District Court's order is invalid because it requires integration of schools according to a fixed racial ratio, in violation of the rules set out in Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 23, 24, 91 S.Ct. 1267, 28 L.Ed.2d 554 and 3) that the plan ordered into effect should be reconsidered because of what the defendant School Board claims to be adverse effects on the health and safety of school children involved.
 
 
 10
 Plaintiffs as cross-appellants claim 1) that the District Court erred in adopting the Department of Health, Education and Welfare plan when the plan proposed by plaintiffs would have achieved a greater degree of integration; and 2) that the HEW plan should have been rejected because it places the burden of desegregation disproportionately upon Negro children.
 
 HISTORY OF THE NASHVILLE-DAVIDSON COUNTY CASE
 
 11
 The history of school desegregation from Brown v. Board of Education, supra, to date can be traced in this case in the proceedings in the District Court, in this Court, and in the United States Supreme Court: Kelley v. Board of Education of City of Nashville, 139 F.Supp. 578 (M.D.Tenn.1956) (Dissolution of three-judge court); Kelly v. Board of Education of City of Nashville, 159 F. Supp. 272 (M.D.Tenn.1958) (Disapproval of integration plan and grant to Board of additional time to file a new plan); Kelley v. Board of Education of City of Nashville, 8 R.R.L.R. 651 (M.D.Tenn.1958) (Approval of 12-year plan); Kelley v. Board of Education of City of Nashville, 270 F.2d 209 (6th Cir. 1959) (Upholding District Court order); Kelley v. Board of Education of City of Nashville, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959) (Denial of certiorari); Maxwell v. County Board of Education of Davidson County, 203 F.Supp. 768 (M.D.Tenn.1960); Maxwell v. County Board of Education of Davidson County, 301 F.2d 828 (6th Cir. 1962), reversed in part and remanded sub nom. Goss v. Board of Education of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963); Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, 293 F.Supp. 485 (M.D.Tenn.1968) (Further proceedings in a consolidation of Maxwell, supra, and Kelly, supra); Kelley v. Metropolitan County Board of Education, 317 F.Supp. 980 (M.D.Tenn.1970); Kelley v. Metropolitan County Board of Education of Nashville, Tennessee, 436 F.2d 856 (6th Cir. 1970) (Memorandum opinion of the U. S. District Court (M.D.Tenn.) (filed June 28, 1971); Judgment (filed July 15, 1971)).
 
 
 12
 This case began in 1955 on the heels of the United States Supreme Court's decision in Brown v. Board of Education, supra, holding that "separate educational facilities are inherently unequal," supra, 347 U.S. at 495, 74 S.Ct. at 692. Plaintiffs in a class action sought invalidation of the Tennessee school laws, T.C.A. Sec. 49-3701 et seq., which in specific terms required segregation of school pupils by race. (See Appendix A) In 1956 a three-judge federal court which had been convened to pass on the constitutionality of the state statute was dissolved when the defendant Board of Education conceded the unconstitutionality of the state statute by which it had previously been governed. Kelley v. Board of Education of City of Nashville, 139 F.Supp. 578 (M.D. Tenn.1956). The case was then remanded to the United States District Court for the Middle District of Tennessee. The District Judge determined that the case was an appropriate class action under Rule 23 of the Federal Rules of Civil Procedure (Record, Min. Book 19 at 683). He ordered the defendant School Board to prepare and present a plan for desegregation of the Nashville schools.
 
 
 13
 Before judgment was entered, the State of Tennessee in January 1957 adopted a Parental Preference Law, T.C.A. Sec. 49-3704, Pub.Acts 1957, cc. 9-13, 2 Race Rel.L.Rep. 215 (1957). (See Appendix A) This statute provided for separate white, black, and mixed schools, with attendance to be determined by parental preference. The District Court in September of 1957 held this statute to be unconstitutional on its face. 2 Race Rel.L.Rep. 970 (1957).
 
 
 14
 The defendant School Board thereupon (and nonetheless) presented a parental preference plan for white, black, and mixed schools substantially the same as that called for by the unconstitutional state law.
 
 
 15
 In February of 1958 the District Court held the School Board plan to be unconstitutional.
 
 
 16
 Later in the same year a grade-a-year desegregation plan was submitted by defendant School Board, approved by the District Court and the Court of Appeals, with certiorari denied by the United States Supreme Court.
 
 
 17
 In 1960 a suit was filed to desegregate the Davidson County schools. Maxwell v. County Board of Education of Davidson County, supra. It was brought on behalf of Negro children alleged to be denied their constitutional rights to equal education in the county school system. Again the suit was brought as a class action and recognized as such by the District Court under Rule 23 Fed.R.Civ.P. (Record, Min. Book 24 at 114.) The Davidson County School Board proposed a free transfer plan and it was approved by the District Court. On appeal Maxwell's free transfer plan was invalidated by the United States Supreme Court, sub nom., Goss v. Board of Education of Knoxville, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963).
 
 
 18
 In 1963 the school systems of Nashville and Davidson County were then consolidated as part of a general consolidation of the City of Nashville and County of Davidson into one metropolitan government. Petitions for further relief, including an order to desegregate the Nashville-Davidson County schools and to enjoin further school construction pending such an order, were filed in the consolidated case, with additional plaintiffs intervening.
 
 
 19
 In 1968 the United States Supreme Court took further note of how the Brown II phrase "deliberate speed" was being employed to delay rather than to implement school desegregation.
 
 
 20
 For purposes of reemphasis, we again quote the unanimous opinion:
 
 
 21
 [A] plan that at this late date fails to provide meaningful assurance of prompt and effective disestablishment of a dual system is also intolerable. "The time for mere 'deliberate speed' has run out," Griffin v. County School Board, 377 U.S. 218, 234 [84 S.Ct. 1226, 12 L.Ed.2d 256] "the context in which we must interpret and apply this language [of Brown II] to plans for desegregation has been significantly altered." Goss v. Board of Education, 373 U.S. 683, 689 [83 S.Ct. 1405, 10 L.Ed.2d 632]. See Calhoun v. Latimer, 377 U.S. 263 [84 S.Ct. 1235, 12 L.Ed.2d 288]. The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work NOW. Green v. County School Board of Kent County, 391 U.S. 430, 438-439 [88 S.Ct. 1689, 20 L.Ed.2d 716] (1968). (Emphasis added.)
 
 
 22
 On the heels of these decisions plaintiffs sought relief consistent with them and lengthy hearings followed. In 1970 the District Judge entered findings of fact which were subsequently reviewed and given effect by this court. Kelley v. Metropolitan County Board of Education of Nashville, Tennessee, 436 F.2d 856 (1970). In its opinion this court said:
 
 
 23
 It would be well for those in authority in Nashville and Davidson County to read the able opinion [District Court opinion entered July 16, 1970] which we now revitalize by our present order. The emphasis in the quotation which follows is that of this court:
 
 
 24
 "[I]t is the Court's view that in the area of school zoning, school boards will fulfill their affirmative duty to establish a unitary school system only if attendance zone lines are drawn in such way as to maximize pupil integration. In drawing such lines, the defendant school board may properly consider in the total equation such factors as capacities and locations of schools, physical boundaries, transportation problems, and cost; however, none of these considerations can supersede the importance of the primary goal of maximizing integration.
 
 
 25
 "In looking to the facts of this case, the Court finds that many of the elementary and secondary school zone lines in the Nashville and Davidson County School System have not been drawn so as to minimize integration. With the exception of zone lines drawn for new schools, the zone lines currently in existence were drawn prior to Brown v. Board of Education with the aim of maintaining segregation. Though there has been some black population migration to formerly white areas, in large part these zone lines continue to serve quite well the segregative purpose for which they were originally established. The truth of this statement is made manifest when one examines the racial makeup of the pupil population in areas containing several contiguous attendance zones. In East Nashville, for example, there is a cluster of five elementary schools having contiguous attendance zones. Of these five schools, white pupils are in the great majority in four schools, Baxter, Dalewood, Rosebank, and Bailey, while black students are in the majority in one of the schools, Inglewood. As a reference to the zone map will indicate, Inglewood is completely surrounded by the four predominantly white schools, and the Inglewood zone is drawn to enclose most of the black population living in the five school area. Defendants argue that they are applying the 'neighborhood' concept in the drawing of elementary school zone lines. If such a concept is indeed being applied in this five school area, it appears to the Court that it is being applied solely to perpetuate segregation. Defendants contend that one of the prime advantages of 'neighborhood' schools is that they allow pupils to walk to and from school. If this is true, it is difficult to see why black pupils who live closer to Baxter or Bailey schools, for instance, are required to walk the greater distance to attend Inglewood school.
 
 
 26
 "The same pattern is repeated in a seven school area in south and west Nashville. In this situation, the attendance zones for Ransom and Eakin schools are contiguous with the attendance zones for Ford, Greene, Head, Carter Lawrence, Murrel and Clemons schools. The former two schools are almost completely white, while the latter five schools are almost totally black.[7] Once again it appears that the zone lines as drawn insure that white neighborhoods will have white schools and black neighborhoods will have black schools. As the above two illustrations make clear, by maintaining the old dual school zones, defendant has encouraged continued segregation rather than significant integration in the elementary schools.
 
 
 27
 "Turning to junior high school zones, the Court finds much the same situation as in the elementary schools. Though the 'neighborhood' concept is not applied in secondary school zoning, junior high school zones are drawn so that each school serves a particular residential area or 'service area' as it is sometimes referred to by defendant. These service areas cover a broader geographic area than a single neighborhood, for several elementary schools within their respective neighborhood zones feed graduating students into the junior high school within whose zone they lie. This process is generally described in terms of a 'feeder pattern.' Once again, a look at the existing zone lines convinces the Court that the junior high school attendance zones and the 'feeder patterns' which graduate elementary students into the junior high schools are structured so as to foster for the most part continued segregation or at best only token integration. It is apparent that the zone lines as presently drawn are designed to provide racially identifiable 'black' schools for black residential areas and 'white' schools for white residential areas. For example, looking at a cluster of six contiguous junior high school zones, the Court finds that Bass, West End, and Moore Junior high schools are all predominantly white schools with their attendance zones being drawn so as to correspond significantly with white residential areas. On the other hand, Washington, Rose Park and Waverly-Belmont are all racially identifiable as black schools and their attendance zones have been drawn in a manner effectively to prevent a significant number of black pupils from attending school outside of the black residential area.[8]
 
 
 28
 "Finally, looking to the high school zones, there is similar evidence of continued duality in the school system. For example, of five contiguous high school zones, three of the schools, Cohn, Hillsboro and Central, are racially identifiable as white schools. Their attendance zone lines form the boundary line between the predominantly white residential areas in south and west Nashville and the black residential areas to the north and east. These black areas are served by Cameron and Pearl high schools.[9]
 
 
 29
 "In connection with the segregative effect of present school zoning, it is interesting to note that while portable classrooms are in limited use in predominantly Negro schools, approximately 117 portables are in use in racially identifiable white schools. These predominantly Negro schools, on the basis of their rated maximum capacities, have approximately 5,400 vacancies, yet the white schools, in zones tailored to white residential sections, are overcrowded. It would seem that rezoning could serve the dual purpose of alleviating this overcrowding and, at the same time, promoting the goal of integration.
 
 
 30
 "It is the Court's conclusion that defendant's current policy of attendance zoning does not facilitate rapid conversion from a dual to a unitary school system. As is evident from the foregoing discussion, the zone lines as they presently exist foster continued segregation in many instances.[10] Corresponding as they do to racial residential patterns, it is difficult to envision any other result. Historic zone lines which purposely promote segregation must be altered. In making such alterations defendant board should take those steps 'which promise realistically to convert promptly to a system without a "white" school and a "Negro" school, but just schools.' Green v. County School Board of New Kent County, supra [391 U.S. 430] at 442, [88 S. Ct. 1689, 20 L.Ed.2d 716]."
 
 
 31
 Kelley v. Metropolitan County Board of Education of Nashville, Tennessee, supra at 859-861. (Footnotes in quotation.)"
 
 
 32
 We then remanded the case with instructions:
 
 
 33
 We believe that "the danger of denying justice by delay" in this case is as clear as it was in Alexander, supra; Green v. County Board, supra, and Carter, supra.
 
 
 34
 We now vacate the stay of August 25, 1970, with the intention of leaving in full effect and operation the judgment of the District Court of August 13, 1970. The present District Judge should proceed immediately to hold the necessary hearings upon objections to the Board of Education plan and thereafter to approve or modify same as the record which is developed appears to require, and thereupon enter an order of implementation. The time schedule for consideration and implementation of this order should, of course, meet the "maximum" standard set forth by the Supreme Court in the second Carter case (Carter v. West Feliciana Parish School Board, 396 U.S. 290, 293, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970)). The District Court may, of course, require reports (including a pupil locator map) and recommendations (including those of expert witnesses and the Department of Health, Education and Welfare) and consider them in its order of implementation. Id. at 862.
 
 
 35
 Acting within the terms of his sworn obligation a new District Judge proceeded to implement this court's instructions.
 
 
 36
 While he was thus engaged, the United States Supreme Court decided the third history making case pertaining to school segregation (Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)). The opinion for a unanimous Supreme Court was written by Chief Justice Burger. In recital of the facts and conclusions of law, it parallels and controls our decision of this case.
 
 
 37
 We granted certiorari in this case to review important issues as to the duties of school authorities and the scope of powers of federal courts under this Court's mandates to eliminate racially separate public schools established and maintained by state action. Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954) (Brown I).
 
 
 38
 This case and those argued with it arose in States having a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race. That was what Brown v. Board of Education was all about. These cases present us with the problem of defining in more precise terms than heretofore the scope of the duty of school authorities and district courts in implementing Brown I and the mandate to eliminate dual systems and establish unitary systems at once. Swann v. Charlotte-Mecklenburg Board of Education, supra at 5-6, 91 S.Ct. at 1271 (Footnote omitted.)
 
 
 39
 These words apply exactly to the fundamental problems in the instant case also. The District Court order here under review is designed to "eliminate racially separate public schools established and maintained by state action." Tennessee is, as we have noted above, a state "having a long history of maintaining two sets of schools in a single school system deliberately operated to carry out a governmental policy to separate pupils in schools solely on the basis of race." (See Appendix A) We here consider a District Court order designed to "implement . . . Brown I and . . . to eliminate dual systems and establish unitary systems at once."
 
 
 40
 The District Court held numerous hearings and received voluminous evidence. In addition to finding certain actions of the school board to be discriminatory, the court also found that residential patterns in the city and county resulted in part from federal, state, and local government action other than school board decisions. School board action based on these patterns, for example, by locating schools in Negro residential areas and fixing the size of the schools to accommodate the needs of immediate neighborhoods, resulted in segregated education. These findings were subsequently accepted by the Court of Appeals. Swann v. Charlotte-Mecklenburg Board of Education, supra at 7, 91 S.Ct. at 1272.
 
 
 41
 This paragraph applies to the facts of the instant case without change of a single word.
 
 
 42
 Chief Justice Burger then turned to the question of appropriate remedial measures to eliminate state imposed segregation:
 
 
 43
 The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck by Brown I as contrary to the equal protection guarantees of the Constitution. That was the violation sought to be corrected by the remedial measures of Brown II. That was the basis for the holding in Green that school authorities are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." 391 U.S., at 437-438 [88 S.Ct. 1689, 20 L.Ed.2d 716].
 
 
 44
 If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.
 
 
 45
 ******
 
 
 46
 * * *
 
 
 47
 In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults.
 
 
 48
 School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court. As with any equity case, the nature of the violation determines the scope of the remedy. In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system. Swann v. Charlotte-Mecklenburg Board of Education, supra at 15-16, 91 S.Ct. at 1275.
 
 
 49
 The default of school authorities referred to by Chief Justice Burger is equally illustrated by the history of our present case.
 
 
 50
 With this history and these principles before us, a tabular comparison of the fact situations and District Court plans presented in the Swann and Kelley cases is appropriate:
 
 
 51
 SWANN v. BD. ED. KELLEY v. BD. ED.
Date of original complaints 1965 1955
No. of schools (before plan) 107 (1968-69) 139 (1970-71)
No. of schools (after plan) 107 133 (1971-72)
Total enrollment 84,000 (approx.) 94,170 (1970-71)
Per cent white students 71% 75% (75.12%)
Per cent black students 29% 25% (24.63%)
Walking distance (after plan) 1 1/2 miles 1 1/2 miles
No. students bused prior to 23,600 33,485
 plan
No. white students bused prior Exact figures not 30,000
 to plan available, but it
 is
No. black students bused prior clear that a large 3,500 (approx.)
 to plan majority of
 students bused were
 white
Extent of segregation prior to In 1969 2/3 of the In 1969 81% of all
 plan black students were white students were
 then attending attending schools
 schools that were that were over 90%
 either totally or white, while 62% of
 99% black. all black students
 were attending
 schools that were
 over 90% black.
Net increase in No. of students 13,300 15,000 (approx.)
 bused as a result of court
 adopted plan
No. of additional buses 138 54-passenger 82 84-passenger buses
 required buses
No. of buses obtained to carry Court opinions do not None
 out plan contain this
 information.
Ratio of white to black student 71%-29% 75%-25%
 population employed by court
 approved plan as guide
Per cent of schools 100% of elementary 77% of elementary
 desegregated by plan within* schools would schools would have a
 guide related ratios have black student black student
 population of population of
 9%-38%. 16%-41%; 22 outlying
 schools would have a
 black student
 population of 0% -
 22%.
One race schools remaining Apparently none 5
 under plan due to travel
 distance
* Junior and Senior High School desegregation under the Swann plan was likewise 
considerably closer to ideal unitary school standards than the plan approved by 
by the District Court in this case.
 
 
 52
 The general principles of Swann were, of course, enunciated by the Supreme Court for guidance of District Courts and Courts of Appeals in all school segregation cases. In view of the close factual resemblances between this case and Swann, these principles, however, apply here a fortiori.
 
 THE REMEDIAL ORDER OF THE DISTRICT COURT
 
 53
 The nature of the problem facing the District Court many years after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), is vividly portrayed in the statistics and the table set forth below.[1]
 
 Racial Composition for the Three
 Years Preceding Hearings on
 Motion for Further Relief
 
 54
 1967-68--85% of the white students attended schools that were over 90% white.
 
 
 55
 63% of the black students attended schools that were over 90% black.
 
 
 56
 1968-69--80% of the white students attended schools that were over 90% white.
 
 
 57
 61% of the black students attended schools that were over 90% black.
 
 
 58
 1969-70--81% of the white students attended schools that were over 90% white.
 
 
 59
 62% of the black students attended schools that were over 90% black.
 
 
 60
 These figures show that during the three-year period nearly two-thirds of the black students in the Nashville system went to racially identifiable schools, and more than four-fifths of the white students attended racially identifiable schools.
 
 
 61
 Busing did not come to Nashville by federal court decree. This record demonstrates that Nashville and Davidson County have long used extensive bus transportation as a normal part of their school systems. Busing was, however, employed wholly disproportionately for the transportation of its white students as compared to its black students (30,000 white to 3,500 black). In this regard the District Judge's opinion noted:
 
 
 62
 Since the defendants have consistently transported large numbers of students to promote segregation, some adjustment must be made to reverse this unconstitutional practice.
 
 
 63
 The District Court clearly found that defendants had defaulted in relation to their duty to dismantle their segregated school system prior to 1970. The District Court also found that although defendants had repeatedly been asked and ordered to produce an adequate plan, they had failed to do so. It noted that the School Board accepted as a policy statement "an ideal student racial ratio of an integrated school as one which is 15% to 35% black." Yet its analysis of the plan actually submitted by the School Board showed it to be utterly inadequate.
 
 
 64
 The Board of Education submitted a plan for pupil integration in August, 1970. Included in this plan was a policy statement that the school board "accepts as an ideal student racial ratio of an integrated school as one which is 15% to 35% black."
 
 
 65
 The August, 1970 plan made 49 minor geographic zone changes, and provided for the transportation of an additional 1162 pupils. The result of the plan was to leave the elementary schools significantly unchanged. Six of the 38 high schools and junior high schools would remain at least 50 per cent black. Fifty-seven per cent of the black high school and junior high school students would attend these six schools. The racial composition of two schools would be at least 95 per cent black and four other schools would be at least 90 per cent black. This would result in 47 per cent of the black students attending schools where the composition would be above 90 per cent black. Eight schools, accommodating 20 per cent of the black students, would operate with 15-35 per cent black students. Fifteen schools would operate with 95 per cent or above white students. (Footnotes omitted.)
 
 
 66
 Concerning the School Board plan, the District Court concluded:
 
 
 67
 The pupil integration plan submitted by the school board, viewed in the most favorable light, constitutes mere tinkering with attendance zones, and represents only a token effort. It clearly falls short of meeting the objectives and tests set out in the decisions of the United States Supreme Court. Swann v. Charlotte-Mecklenburg Board of Education, supra; Davis v. Board of School Commissioners, supra; Green v. County School Board, 391 U.S. 430 [88 S.Ct. 1689, 20 L.Ed.2d 716] (1968). In effect, the defendant has made no effort to meet its affirmative duty to establish a unitary school system "in which racial discrimination would be eliminated root and branch." Green v. County School Board, supra, at 437-438 [88 S.Ct. 1689, 20 L.Ed.2d 716]; quoted in McDaniel v. Barresi, U.S. , [91 S.Ct. 1287] 28 L.Ed.2d 582, 585 (April 20, 1971).
 
 
 68
 Since the defendants have, in effect, failed to submit a constitutionally sufficient plan, the Court must examine the other plans. (Footnote omitted.)
 
 
 69
 The plan adopted by the District Judge was one proposed by the United States Department of Health, Education and Welfare. It is described in detail in his Memorandum Opinion, dated June 28, 1971, and in his Judgment, dated July 15, 1971, both of which are by reference hereby incorporated as a part of this opinion. For our present purpose it suffices for us to note that in all respects which have come to our attention, the HEW plan approved by the District Judge represents a somewhat less stringent approach to desegregation than the plan approved by the United States Supreme Court in Swann, supra.
 
 
 70
 Major portions of the Court's comprehensive Opinion and Judgment, such as those dealing with faculty desegregation, school construction and maintenance, and transfer policy, etc., are not discussed herein because no appellate issues have been presented as to those features.
 
 I The Rule 23 Issue
 
 71
 As to the Rule 23 issue, earnestly if belatedly sought to be raised by appellants, we affirm the Memorandum Order of the District Judge, dated July 21, 1971, for the reasons set forth therein, and print same for ready reference as Appendix B.
 
 
 72
 Further, we note that this issue was clearly waived by failure of appellants to raise it prior to trial and final adjudication of this case.
 
 
 73
 We also note that such a class action as this dealing with continuing constitutional violations does not become moot because of years of delay (much of it attributable to appellants) which occasioned the graduation of the named, original student plaintiffs from the school system before final decision.
 
 II The Ratio and Residual Effect Issues
 
 74
 (Plaintiffs' stated Issues 2, 3 & 4)
 
 
 75
 Where a school system has been deliberately constructed on a segregated basis by state action, a duty inheres in the School Board to do more than to establish rules fair on their face which simply serve to perpetuate the effects of such segregation. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 28, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
 
 
 76
 The record in this case supports the District Judge's findings that racial discrimination in school construction, assignment of temporary buildings, assignment of teachers, and assignment of students continued until the close of the record--if not beyond. The record also discloses a background of racial discrimination by means of state law which motivated much of the school segregation. (See Appendix A)The fact that population shifts in the metropolitan school district have helped to some degree to change the racial composition of some schools during the course of litigation does not eliminate the duty of the school board to present a plan for a unitary school system.
 
 
 77
 Nor, of course, does it alter the duty of the District Court on default of the school board to require production of such a plan and order it into effect. Chief Justice Burger put the matter thus in the Davis case:
 
 
 78
 Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. Davis v. School Commissioners of Mobile County, supra, 402 U.S. at 37, 91 S.Ct. at 1292.
 
 
 79
 Perhaps the primary thing that the Swann case decided was that in devising plans to terminate such residual effects, it is appropriate for the school system and the District Judge to take note of the proportion of white and black students within the area[2] and to seek as practical a plan as may be for ending white schools and black schools and substituting therefor schools which are representative of the area in which the students live.
 
 
 80
 We have noted that the District Judge in Swann employed a flexible 71% white to 29% black population ratio as a guide in seeking a practical plan. The Supreme Court specifically approved his doing so. See Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 16, 23-24, 91 S.Ct. at 1267, 28 L.Ed.2d 554. The District Judge, in this case clearly read and followed the Swann guideline. As to this issue, we find no error.
 
 
 81
 An earlier finding of "good faith" does nothing to excuse the defaults and failures shown by this record. "The measure of any desegregation plan is its effectiveness." Davis v. School Commissioners of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). See also Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
 
 III Practical Problems
 
 82
 If there is an appellate issue of substance in this appeal, it is to be found in the practical problems which appellants claim have developed since the entry of the District Judge's order. Appellant summarizes these issues thus:
 
 
 83
 A plan which exposes the children in the school system to undue danger to health and accident, interferes with their education by requiring excessive periods of time on buses, causes them to leave home before daylight or to return home after dark, exposes them to the dangers of travel in old and inadequately maintained equipment and causes elementary school children, both black and white, to suffer hardships to which young children should not be exposed can hardly be termed feasible, workable, effective and realistic.
 
 
 84
 Substantial as these problems appear to be on the surface, there are two reasons why no relief can be granted in this forum. The first is that no motion for relief pertaining to these facts has ever been filed by appellant in the District Court. These statements at this point are allegations and they are controverted by the appellee. This, of course, is an appellate court--not a trial court. As appellants well know, the arena for fact-finding in the federal courts is the United States District Court. Until these claims have been presented in a trial court, with an opportunity for sworn testimony to be taken and controverted issues and facts decided by the processes of adversary hearing, this court has no jurisdiction.[3]
 
 
 85
 The second reason as to why appellants are entitled to no relief on this issue probably serves to explain the first. The entire "record" upon which appellant bases his plea for relief as to practical problems is a "Report to the Court" of Dr. Brooks, Director of Schools of the Metropolitan County Board of Education. This report is dated October 18, 1971, just over a month after the opening of school. While we are advised that it was sent to the District Judge, as we have noted, no motion of any kind seeking any District Court action was ever filed concerning it. Even more important, the statement on its face suggests that local authorities in Nashville and Davidson County have not made good faith efforts to comply with the order of the District Judge.
 
 
 86
 Dr. Brooks' affidavit does present this exculpatory explanation which serves to point in the direction of other authorities as those responsible for the inconveniences and hazards of which Dr. Brooks' statement speaks. The statement says:
 
 
 87
 The School Board is fiscally dependent in that its budgets must be approved by the Metropolitan City Council. In approving the budget of the School Board on June 30, 1971, Council members demanded assurance that no funds included in the budget would be used to purchase buses for the purpose of transporting students to establish a racial balance. The 1971-72 budget did provide for the purchase of 18 large buses to replace obsolete equipment to provide transportation for students to the new comprehensive McGavock High School.
 
 
 88
 It is clear, however, that neither the Metropolitan City Council or, for that matter, the Legislature of Tennessee can forbid the implementation of a court mandate based upon the United States Constitution. In a companion case to Swann, supra, Chief Justice Burger, writing again for a unanimous court held that an anti-busing law which flatly forbids assignment of any student on account of race or for the purpose of creating a racial balance or ratio in the schools and which prohibits busing for such purposes was invalid as preventing implementation of desegregation plans required by the Fourteenth Amendment. North Carolina State Board of Education v. Swann, 402 U.S. 43, 45-46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971). See also Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).
 
 
 89
 Dr. Brooks' statement also furnishes the bus schedule of the Metropolitan County Board of Education by yearly models. It shows that the Board has an average of 18.9 buses for each of the last 10 model years. The 18 buses purchased in 1971 were described by Dr. Brooks as "to replace obsolete equipment." It appears from the Metropolitan Board's own statements that the Board and the local authorities in Nashville did not purchase one piece of transportation equipment for the purpose of converting the Metropolitan County Board of Education school system from a dual school system segregated by race into a unitary one, as called for by the District Judge's order.
 
 
 90
 At court hearing we had been puzzled as to why counsel for the Board had failed to go back to the District Court to report on the grievous circumstances which he so strongly alleged before us. Like most decrees in equity, an injunctive decree in a school desegregation case is always subject to modification on the basis of changed circumstances. Sloan v. Tenth School District of Wilson County, 433 F.2d 587, 589-590 (6th Cir. 1970). Further acquaintance with the record, which, of course, the District Judge would have known in detail, leaves us in no further quandry as to the reasons for counsel's reluctance.
 
 IV Plaintiffs-Appellants' Plan
 
 91
 Our review of this record convinces us that the District Judge's choice of the HEW plan as opposed to plaintiffs' plan was well within his judicial discretion. It may not be ideal, but to us it seems clearly to be a plan for ending a dual school system based on race and substituting therefor a unitary one. It promises to work and to work now. Green v. County School Board of Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).
 
 
 92
 V. Plaintiffs-Cross-Appellants' Discrimination Claim
 
 
 93
 Plaintiffs-Cross-appellants claim that the grade school plan discriminates against Negro students in the lowest elementary grades.
 
 
 94
 The feature complained of in this issue is the transportation of black students in grades 1-4 to outlying schools, paralleled by the cross-transportation of white students in grades 5-6. In this regard the HEW plan appears to follow the pattern of the school plan approved in Swann. Swann v. Board of Education, supra, 402 U.S. at 10, 91 S.Ct. 1267, 28 L.Ed.2d 554. The Supreme Court made no reference to this feature, and neither in Swann nor in this case does the record seem to provide adequate rationale for it. We do not believe, however, that we can appropriately hold that the District Judge abused his discretion in approving the HEW plan which (like the plan in Swann) incorporated this feature.
 
 
 95
 It may be that this is a temporary expedient or it may be that there are practical reasons to justify it for longer duration. In any event, any adverse effects of this aspect of the plan can, of course, likewise be brought to the District Judge's attention when the case is back before him.
 
 The Intervention
 
 96
 Twenty-four hours before oral arguments in this appeal, the United States Department of Justice filed a motion to intervene as amicus curiae. In spite of the extraordinary delay in filing the motion, we granted leave to intervene and invited the representative of the Justice Department who appeared to address the court.
 
 
 97
 On reading the motion, hearing oral argument, and questioning counsel, we determined that the representative of the Justice Department had not had the opportunity to read the District Court record in this case and was not aware in advance of hearing that the claimed practical problems had never been presented to or adjudicated by the District Judge.
 
 One America
 
 98
 This nation has been told by a Presidential Commission that our country is rapidly becoming divided into two societies--one black and one white. Report of National Advisory Commission on Civil Disorders 1 (3/1/68).
 
 
 99
 The Constitution of the United States was written for one nation, "indivisible." As it speaks to men's consciences, the Constitution argues against division and apartheid.
 
 
 100
 In the public domain, however, the Constitution commands. Here the constitutional command is One America.
 
 
 101
 The Constitution and the Supreme Court opinions quoted above do not command the use of busing any more than they command the use of books, desks, paper, pens, buildings, lights, heat, and other tools, equipment and supplies needed in modern life and in modern education. What the Constitution and the Supreme Court say about the principal issue of this case is that no one may forbid a school board (or a federal court) from employing any of the tools of modern life in carrying out a constitutional mandate. Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 37-38, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).
 
 
 102
 The District Court order in this case specifically retained jurisdiction. Thus, upon our affirmance, the door of the District Court is clearly open (as it has been!) to the parties to present any unanticipated problems (not resulting from failure to comply with its order) which may have arisen or may arise in the future.
 
 
 103
 We now affirm the findings of fact, conclusions of law, and judgments of the District Court.
 
 
 104
 The District Judge's order noted that no stay would issue and we likewise note that any stay of this order must be sought from the United States Supreme Court.
 
 APPENDIX A
 CHAPTER 37
 SEGREGATION OF RACES
 
 105
 SECTION.
 
 
 106
 49-3701-49-3704. [Unconstitutional.]
 
 
 107
 49-3701--49-3703. [Unconstitutional.]
 
 
 108
 Complier's Note. Under the decision of Roy v. Brittain (1956), 201 Tenn. 140, 297 S.W.2d 72, the statutes providing for the compulsory separation of races in the field of public education are no longer in effect, and therefore these sections have been omitted. They read:
 
 
 109
 49-3701. Interracial schools prohibited.--It shall be unlawful for any school, academy, college, or other place of learning to allow white and colored persons to attend the same school, academy, college, or other place of learning. [Acts 1901, ch. 7, Sec. 1; Shan., Sec. 6888a37; Code 1932, Sec. 11395.]
 
 
 110
 49-3702. Teaching of mixed classes prohibited.--It shall be unlawful for any teacher, professor, or educator in any college, academy, or school of learning to allow the white and colored races to attend the same school, or for any teacher or educator, or other person to instruct or teach both the white and colored races in the same class, school, or college building, or in any other place or places of learning, or allow or permit the same to be done with their knowledge, consent, or procurement. [Acts 1901, ch. 7, Sec. 2; Shan., Sec. 6888a38; Code Sec. 11396.]
 
 
 111
 49-3703. Penalty for violations.--Any persons violating any of the provisions of this chapter, shall be guilty of a misdemeanor, and, upon conviction, shall be fined for each offense fifty dollars ($50.00), and imprisonment not less than thirty (30) days nor more than six (6) months. [Acts 1901, ch. 7, Sec. 3; Shan., Sec. 6888a39; mod. Code 1932, Sec. 11397.] 49-3704. [Unconstitutional.]
 
 
 112
 Compiler's Note. This section was held unconstitutional in Kelley v. Board of Education (1959), 6 Cir. 270 F.2d 209 and is, therefore, omitted. It read:
 
 
 113
 49-3704. Separate schools authorized. --Boards of education of counties, cities and special school districts in this state are authorized to provide separate schools for white and negro children whose parents, legal custodians or guardians voluntarily elect that such children attend school with members of their own race. [Acts 1957, ch. 11, Sec. 1.]
 
 CHAPTER 22--TRANSPORTATION OF SCHOOL CHILDREN
 
 114
 SECTION.
 
 
 115
 49-2201. Power of boards to provide transportation--Use to achieve racial balance prohibited.
 
 
 116
 49-2210. Color and markings of buses.
 
 
 117
 49-2213. Speed limit.
 
 
 118
 49-2201. Power of boards to provide transportation--Use to achieve racial balance prohibited.--Boards of education may provide school transportation facilities for children who live over one and one-half (1 1/2) miles by the nearest accessible route from the school to which they are assigned by the board of education and in which they are enrolled; provided, however, that the boards of education may, in their discretion, provide school transportation facilities for children who live less than one and one-half (1 1/2) miles by the nearest accessible route from the school in which they are enrolled, but the county shall not be entitled to receive state transportation funds for any student, other than physically handicapped children, who live less than one and one-half (1 1/2) miles by the nearest accessible route from the school in which they are enrolled; provided, that nothing in this chapter shall be construed to prevent a board of education from transporting physically handicapped children, regardless of the distance they live from school, under rules and regulations adopted by the state board of education with the approval of the state commissioner of education; and provided further, that said boards shall have power to purchase school transportation equipment, employ school transportation personnel, and contract for transportation services with persons owning equipment, and pay for same out of funds duly authorized in the budget approved by the quarterly county court; provided further, that said boards in employing school transportation personnel and in contracting for transportation services with persons owning equipment are hereby authorized to enter into contracts for such services for periods of time as long as, but not exceeding, four (4) years from the date of making such contracts, it being the purpose of this section to permit a reasonable degree of employment security for such school transportation personnel.
 
 
 119
 Provided, however, no board of education shall use or authorize the use of any school transportation facilities for the purpose of achieving a racial balance or racial imbalance in any school by requiring the transportation of any student or pupil from one school to another or from one school district established for his neighborhood to another. [Acts 1947, ch. 92, Sec. 1; 1949, ch. 233, Sec. 1; C.Supp.1950, Sec. 2495.1 (Williams Sec. 2495.2); Acts 1957, ch. 10, Sec. 1; 1957, ch. 400, Sec. 1; 1970 (Adj. S.), ch. 491, Sec. 1.]
 
 
 120
 Amendment. The 1970 amendment added the last paragraph to this section.
 
 
 121
 Effective Date. Acts 1970 (Adj. S.), ch. 491, Sec. 2. February 27, 1970.
 
 
 122
 [Note that a statute similar to the proviso in the last paragraph of the statute above was held unconstitutional by the United States Supreme Court. North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971).]
 
 APPENDIX B
 MEMORANDUM AND ORDER
 
 123
 (Filed July 21, 1971)
 
 
 124
 The defendant Metropolitan County Board of Education of Nashville and Davidson County, Tennessee, filed two motions, to-wit, a motion to set aside the judgment entered in this cause on July 16, 1970, and a motion to set aside the memorandum opinion filed June 28, 1971, which motions are grounded on the failure of the Court to comply with Rule 23 of the Federal Rules of Civil Procedure.
 
 
 125
 Apparently these motions were filed without counsel for the defendant having made even a casual perusal of the record in the consolidated cases.
 
 
 126
 The history of the consolidated cases reveals:
 
 
 127
 The first cause of Robert W. Kelley, et al. v. Board of Education of the City of Nashville, Davidson County, Tennessee, et al., Civil No. 2094, was filed on September 23, 1955. This case will be hereinafter referred to as the "first case."
 
 
 128
 The case of Henry C. Maxwell, Jr., et al. v. County Board of Education of Davidson County, Tennessee, et al., Civil No. 2956, was filed on September 19, 1960. This case will be hereinafter referred to as the "second case."
 
 
 129
 These cases were consolidated by consent order filed September 10, 1963.
 
 
 130
 Rule 23 of the Federal Rules of Civil Procedure as to class action was amended, effective July 1, 1966. Prior to the amendment, class actions were referred to as "spurious" or "true" class actions. Prior to the amendment, the requirements for the maintenance and determination of the existence of a proper class action were less stringent than those requirements as set forth in Rule 23, as amended. Prior to its amendment, Rule 23 did not require detailed findings and determinations by the Court as set forth in subsection (c) of the Rule, as amended.
 
 First Case
 
 131
 By Memorandum filed on January 21, 1957, the Honorable William E. Miller determined "that the rights of the plaintiffs and others similarly situated to attend the public schools of the City of Nashville without discrimination on account of race are recognized and declared, . . ." Record, Min. Book 19, at 679.
 
 
 132
 By findings of fact and conclusions of law filed on February 20, 1957, the Honorable William E. Miller adjudicated that Case No. 2094 was "properly brought as a class action under Rule 23(a) of the Federal Rules of Civil Procedure. Title 28 U.S.C." Record, Min. Book 19, at 783.
 
 
 133
 On August 15, 1958, the case was appealed to the Sixth Circuit Court of Appeals. On July 20, 1959, the Court of Appeals affirmed the judgment of the District Court, thereby affirming the determination of the Honorable William E. Miller that this was a proper class action.
 
 
 134
 On September 10, 1963, a consent order was entered in Case No. 2094, the first case, and Case No. 2956, the second case, in which the parties agreed and stipulated that the functions and powers of the defendants Board of Education of the City of Nashville and County Board of Education of Davidson County were vested in the Metropolitan School System, and the "Transitional Board of Education for the Metropolitan Government of Nashville and Davidson County" was substituted as defendant. All orders, judgments, and other proceedings in the first case and the second case were made effective as to the substituted defendant. There was an express provision that all orders, judgments and proceedings entered previously would remain in full force and effect, and that none of the rights of the parties would be affected or prejudiced.
 
 
 135
 By order of December 3, 1964, the Metropolitan County Board of Education and its board members were made parties defendant in lieu of the Transitional Board. Again, there was a provision that all orders, judgments and proceedings in both cases would remain in full force and effect and that none of the rights of any parties would be affected or prejudiced.
 
 
 136
 By order entered on October 7, 1968, certain additional parties, including infants and their parents, were added as intervening plaintiffs to have full standing as plaintiffs.
 
 
 137
 The two cases were again appealed to the Sixth Circuit Court of Appeals. The opinion of the Court of Appeals was filed in this Court on February 8, 1971.
 
 Second Case
 
 138
 On November 23, 1960, the Honorable William E. Miller adjudicated that "this is a class action brought not only by the plaintiffs for their own benefit but also on behalf of all other persons similarly situated." Record, Min. Book 24, at 114.
 
 
 139
 This case was appealed to the Court of Appeals for the Sixth Circuit on February 20, 1961.
 
 
 140
 The orders in the consolidated cases of September 10, 1963, December 3, 1964, and October 7, 1968, noted above also apply to this case.
 
 
 141
 As appears above, the Honorable William E. Miller carefully adhered to Rule 23 as it existed at the time of the filing of these two cases. The Court of Appeals did not question his determination, but affirmed the actions which he took in the matter. In addition, in the latest mandate to the District Court received from the Court of Appeals in February, 1971, this Court was instructed to implement the July 16, 1970 opinion of the Honorable William E. Miller.
 
 
 142
 This Court does not feel once a class action has been adjudicated and the action of the trial court has been reviewed by the Court of Appeals, that it is necessary or proper to continue to redetermine the standing of the plaintiffs to represent a class. The United States Supreme Court in its order implementing the amendment to Rule 23 states:
 
 
 143
 ". . . the foregoing amendments and additions to the Rules of Civil Procedure shall take effect on July 1, 1966, and shall govern all proceedings in actions then pending except to the extent that in the opinion of the Court their application in a particular action then pending would not be feasible or would work injustice in which event the former procedure applies."*
 
 
 144
 See also Escott v. Barchris Construction Corp., 283 F.Supp. 643 (S.D.N.Y.1968); Polakoff v. Delaware Steeplechase and Race Assn., 264 F.Supp. 915 (Del.1966).
 
 
 145
 This clearly indicates an intent that there should not be a continuous readjudication of this question in cases where there has been a lengthy history of litigation, both in the district and the appellate courts. Frankly, this Court feels that it is not feasible or practical to have continuous adjudication of such items.
 
 
 146
 In view of the above, the Court is not required to determine (1) whether this question should have been raised prior to the adjudication of the cause, and (2) what, if any, effect the alleged failure to comply with Rule 23 would have on the right of the individual plaintiff children who reside throughout Davidson County, Tennessee, to assert their constitutional privilege to attend an integrated school in a unitary school system.
 
 
 147
 The motions are hereby denied.
 
 L. CLURE MORTON
 United States District Judge
 
 148
 McCREE, Circuit Judge (concurring).
 
 
 149
 I agree with the majority opinion on the issues it discusses. Nevertheless, I wish to add a few observations concerning our reasons for rejecting plaintiffs' cross-appeal and affirming for the present, the District Court's selection of the HEW plan.
 
 
 150
 The District Court, in deciding to reject plaintiffs' plan, recognized that under Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); and Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), its duty was to select the plan that appeared to be the most effective in eradicating the effects of past segregation, unless it would be impractical to adopt such a plan. The court found that plaintiffs' plan was "impractical and not feasible" because of the costs and transportation problems that would result from the inclusion of certain outcounty schools in the plan. The court also relied upon the fact that plaintiffs' plan left to the school board the specifics of pupil assignment, grade organization, school structuring, and school district zoning.
 
 
 151
 My colleagues and I agree that there is no need at this juncture to hold that the District Court abused its discretion in thus preferring the HEW plan over that of plaintiffs. The HEW plan promises to accomplish a significant degree of integration, and it is a plan that promises realistically to work and to work now. Green v. County School Board of New Kent County, supra, 391 U.S. at 439, 88 S.Ct. 1689, 20 L.Ed.2d 716. Although plaintiffs' plan might have more effectively desegregated the district's schools, its inclusion of outlying schools and its lack of specificity rendered it, in the court's opinion, impractical and unfeasible. Since the District Court has retained jurisdiction in order to supervise the implementation and effectiveness of the HEW plan, plaintiffs have the option of revising their plan to eliminate the defects noted by the court and requesting the court to make specific changes in the plan to promote, in a practical way, more effective integration. If the court should then find that plaintiffs' plan is "feasible and pedagogically sound," Robinson v. Shelby County Board of Education, 442 F.2d 255, 258 (6th Cir.), on remand 330 F.Supp. 837 (W.D.Tenn.1971), appeal pending, No. 71-1966 (6th Cir.), it would be required to adopt that plan. See Harrington v. Colquitt County Board of Education, 460 F.2d 193 (5th Cir. 1972); Monroe v. Board of Commissioners of City of Jackson, Tennessee, 453 F.2d 259, 262 (6th Cir. 1972), cert. filed, 406 U.S. 945, 92 S.Ct. 2045, 32 L.Ed.2d 333 (1972) (No. 71-1249); Robinson v. Shelby County Board of Education, supra; Davis v. School District of City of Pontiac, Inc., 443 F.2d 573, 576-577 (6th Cir.), cert. denied, 404 U.S. 913, 92 S. Ct. 233, 30 L.Ed.2d 186 (1971). In the special circumstances of this case, therefore, there is no need to remand and thereby possibly jeopardize implementation of the first desegregation plan ordered into effect in this school district that promises, after 17 years of litigation, realistically to work now.
 
 
 152
 With respect to plaintiffs' contention that the District Court abused its discretion in adopting a plan that places the greater burden of desegregation on black children and their parents, I observe initially that, although the plan approved by the Supreme Court in Swann appears to have contained a provision that in some respects resembles one of the features of the HEW plan attacked by plaintiffs herein--the pairing and clustering feature that requires all children in grades one through four to attend suburban schools while all children in grades five and six attend the inner-city schools--Swann cannot be read as uncritically approving any plan employing a similar technique if it has an unreasonably disparate racial impact. The issue apparently was not raised in the Supreme Court and the Court did not discuss it. Moreover, the District Court in Swann, in approving the adoption of this feature of the school board's plan, did so "only (1) with great reluctance, (2) as a one-year, temporary arrangement, and (3) with the distinct reservation that 'one-way bussing' plans for the years after 1969-70 will not be acceptable." Swann v. Charlotte-Mecklenburg Board of Education, 306 F.Supp. 1291, 1298 (W.D.N.C.1969). And, following the Supreme Court's decision in Swann, the District Court rejected a revised plan proposed by the school board because, among other reasons, the plan continued to place a disproportionate burden on black children and their parents without showing any educational justification therefor. Swann v. Charlotte-Mecklenburg Board of Education, 328 F.Supp. 1346, 1352-1353 (W.D.N.C.1971).
 
 
 153
 Since I agree, however, that remand is not required at this time, and since I wish to make it clear what the majority opinion is not holding with respect to this issue, I add the following comments.
 
 
 154
 Without a compelling justification, adoption of a plan that places a greater burden of accomplishing integration on black students and their parents is impermissible, whether this be phrased in terms of an equal protection violation because the plan was the school board's product, see, e. g., Lee v. Macon County Board of Education, 448 F.2d 746, 753-754 (5th Cir. 1971); Carr v. Montgomery County Board of Education, 429 F.2d 382, 385 (5th Cir. 1970); Brice v. Landis, 314 F.Supp. 974, 978-979 (N.D.Cal. 1969), or in terms of an abuse of the court's discretion in fashioning an equitable remedy to rectify the effects of past injustice. Although adoption of such a plan might be justified on the basis of the nature of facilities involved, or on practical, administrative considerations, or on the need to adopt a temporary expedient to assure at least immediate substantial progress toward the creation of a unitary school system (see Swann v. Charlotte-Mecklenburg Board of Education, supra, 306 F.Supp. at 1298), we cannot determine the reason for the District Court's decision because the court did not discuss this issue in its memorandum opinion. Ordinarily, in such a case, we would remand for findings and conclusions by the District Court. See Gordon v. Jefferson Davis Parish School Board, 446 F.2d 266 (5th Cir. 1971) (per curiam).
 
 
 155
 However, the same considerations that argue against remand on the issue of the court's adoption of a less effective plan are persuasive here as well. The integration plan adopted by the court has been in operation during the 1971-72 school year, and the court has retained jurisdiction of this case to oversee and, if necessary, to modify the plan's implementation. The defendant school board has indicated in this court that it intends to seek modification on the basis of asserted practical problems that have become apparent since the plan was put into effect. Plaintiffs have indicated dissatisfaction with the adoption of a plan less effective than that proposed by them, and we have indicated that they may seek further relief in the District Court. In these circumstances, I agree that we should not now disturb the District Court's approval of the HEW plan and possibly encourage the kind of delay and inaction that has caused this case to pend for 17 years. Plaintiffs may seek modification of the court's order on the ground that the plan places a disproportionate burden on black children and their parents, and this issue can be litigated and determined before the beginning of the 1972-73 school year. In this way, the disproportionate burden asserted by plaintiffs will exist at most for only a short period of time and will amount to no more than a transitory phase (assuming the absence of sufficient justification for maintaining it permanently) in the over-all creation of a unitary school system.
 
 
 156
 It is to be emphasized, nevertheless, that our refusal to take affirmative action on this issue at this time results only from the peculiar timing, posture, and history of this case. Our opinion should not be construed in any way as a qualification of the principle that a district court has an obligation to endeavor to distribute the burden of integration equitably on all races and that any deviation from this norm, without a compelling justification, is impermissible.
 
 
 157
 Finally, I observe that the majority opinion does not discuss plaintiffs-appellees' contention that they should be awarded double costs and attorneys' fees because the school board's appeal is frivolous within the meaning of Fed.R. App.P. 38. Since the class action issue obviously has no merit, and since the only issue raised by the Board that might have merit has never been presented to the District Court, I would award the requested double costs and attorneys' fees. See Coppedge v. Franklin County Board of Education, 404 F.2d 1177, 1179-1180 (4th Cir. 1968); cf. Monroe v. Board of Commissioners of City of Jackson, Tennessee, supra, 453 F.2d at 262-263. The long history of this litigation would, in my opinion, make such an award particularly appropriate. Cf. Clark v. Board of Education of Little Rock School District, 449 F.2d 493, 499 (8th Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812.
 
 
 
 [7]
 See Map No. 2 in Appendix and note the following figures* on the enrollment of these schools:
 W B % B
 ---- ---- ----
Ford Greene 0 887 100
Head 0 791 100
Carter Lawrence 0 516 100
Murrel 0 328 100
Clemons 51 519 90
Ransom 355 2 1
Eakin 487 5 1
 
 
 *
 Based on plaintiff's exhibit No. 3
 
 
 [8]
 See Map No. 3 in Appendix and note the following figures:*
 W B % B
 ---- ----- ----
Bass 777 12 2
West End 578 40 6
Moore 999 85 8
Washington 0 1,347 100
Rose Park 11 527 98
Waverly-Belmont 26 260 91
 
 
 *
 Based on plaintiff's exhibit No. 3
 
 
 [9]
 See Map No. 4 in Appendix and note the following figures:
 W B % B
 ----- ----- ----
Cohn 960 45 4
Hillsboro 1,223 15 1
Central 899 203 18
Pearl 1 1,308 100
Cameron 0 1,212 100
 
 
 [10]
 Of the 139 regular schools in the system in 1969-70, 88 had less than 10% black enrollment, 22 had 10% to 40% black enrolling (with the total enrollment of these latter 22 schools constituting only 16% of the entire metropolitan school enrollment), and finally29 schools had more than 40% black enrollment. A clear racial pattern is present
 
 
 [1]
 These statistics are based largely upon plaintiffs' exhibits in the court below, but we can find no contrary evidence offered by defendants
 
 
 [2]
 The area referred to in this case is all of Davidson County, including the City of Nashville, which is included in the jurisdiction of defendant Metropolitan Board of Education
 
 
 [3]
 During the pendency of an appeal, jurisdiction of the case lies, of course, in the appellate court. There is, however, familiar law to deal with an unexpected problem which arises in this period concerning the actual terms of the order or judgment under appeal. The District Court may on being apprised of the problem and having determined its substantiality (with or without hearing) certify to the appellate court the desirability of a remand for completion or argumentation of the appellate record. No memory in this court encompasses a refusal of such a request
 The record is clear that no request for remand was made by the District Court, obviously, at least in part, because appellants made no motion for relief before the District Court.
 
 
 *
 Paragraph 2, Order of the Supreme Court of the United States, February 28, 1966, reporting amendments to the Federal Rules of Civil Procedure for the United States District Courts to the United States Senate and House of Representatives. This is reported in 15 L.Ed.2d lxxv